**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

JAMES SHOOK,

      Petitioner,

vs.                                                                                    No. MC 17-0024 JB

UNITED STATES OF AMERICA,

      Respondent.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on: (i) the Petitioner's Petition for Expungement of a Criminal Offense, filed March 3, 2017 (Doc. 1)("Petition"); and (ii) the Motion to Dismiss Based on Lack of Jurisdiction, filed March 27, 2017 (Doc. 4)("Motion"). The Court held a hearing on August 13, 2019. <u>See</u> Clerk's Minutes at 1, filed August 13, 2019 (Doc. 10). The primary issues are: (i) whether the Court has jurisdiction to rule on a petition for expungement of a criminal offense, where Petitioner James Shook does not argue that his conviction is somehow unlawful, but, instead, argues that the Court should expunge his 1992 bank larceny conviction because Shook alleges that he has suffered adverse employment consequences as a result of his felony conviction and wishes to own a firearm; and (ii) whether Shook has demonstrated that his case presents rare and extraordinary circumstances that are necessary to grant a petition for expungement. The Court concludes that: (i) the Court has ancillary jurisdiction to rule on a petition for expungement of a criminal conviction, because the United States Court of Appeals for the Tenth Circuit held in <u>United States v. Pinto</u>, 1 F.3d 1069, 1070 (10th Cir. 1993), that district courts have inherent equitable authority to expunge criminal convictions; and (ii) the Court will not expunge Shook's criminal record, because (a) Shook does not allege that his conviction is somehow unlawful,

(b) Shook presents no evidence that his conviction was unlawful, (c) Shook's interests in having his conviction expunged -- to possess a firearm -- do not outweigh Respondent United States of America's interest in maintaining accurate criminal records, because the United States, and (d) Shook's case does not present unusually compelling circumstances, because the problems he reports that resulted from his felony convictions are common to all felons.  Accordingly, the Court dismisses the Petition and denies the Motion to Dismiss.

## FINDINGS OF FACT

The Court takes its facts from: (i) the Petition; (ii) the Affidavit in Support of Petition to Expunge Criminal Record, filed October 2, 2019 (Doc. 11)("Shook Aff."); (iii) the Judgment in Criminal Case, filed March 3, 2017 (Doc. 1-1)("J&C"); (iv) the Memorandum of Understanding Regarding Guilty Plea (dated May 4, 1992), filed March 13, 2017 (Doc. 1-2)("Plea Agreement"); (v) the Background Check (dated October 17, 2016), filed March 13, 2017)(Doc. 1-3); and (vi) the Presentence Report (dated June 2, 1992), filed August 18, 2021 (Doc. 13)("PSR").

1. **Shook's Childhood and Early Life**.

1. Shook was born in California in 1972, but spent his childhood primarily in New Mexico.  See PSR ¶¶ 31-32, at 8.

2. Shook "was first identified as having a learning disability in kindergarten" and was later diagnosed as dyslexic.  PSR ¶ 32, at 8.

3. Shook's father abused him both physically and emotionally, and "did not understand" his disabilities.  PSR ¶ 32, at 8.

4. Shook was hospitalized several times during his childhood because of the "severe mental/emotional abuse by his father"; Shook's "admission diagnosis was a conduct disorder and drug abuse."  PSR ¶¶ 32-34, at 8.

5.     Shook withdrew from school at age eighteen, when he was "classified as a sophomore." PSR ¶ 38, at 9.

6.     Shook "was enrolled in special education classes" "throughout his education." PSR ¶ 38, at 9.

7.     After withdrawing from school, Shook worked as a stocker at a small grocery store on Kirtland Air Force Base in Albuquerque, New Mexico, then at Pizza Hut as a delivery driver, and later as a dishwasher at a restaurant in Albuquerque. See PSR ¶¶ 39-41, at 9-10.

**2.     Shook's Criminal Conviction.**

8.     On October 30, 1991, Shook's friend, Robert Frodsham, called Shook and asked Shook to come to Frodsham's home. See PSR ¶ 10, at 4.

9.     Shook drove to Frodsham's home to pick him up. See PSR ¶ 10, at 4.

10.    After Frodsham got in the car, he "informed" Shook "that we were going to rob the bank." PSR ¶ 10, at 5.

11.    Shook's "first reaction was that I did not want to rob the bank, however, Robert talked me into going along with his plan to rob the bank." PSR ¶ 10, at 5; Shook Aff. ¶ 1-2, at 1.

12.    Shook and Frodsham drove to a Bank of America in Albuquerque. See PSR ¶ 10, at 5.

13.    Shook dropped Frodsham off in front of the Bank of America and drove to an apartment complex to wait for Frodsham. See PSR ¶ 10, at 5.

14.    Meanwhile, Frodsham entered the Bank of America "wearing a dark blue overcoat and a dark ski mask and carrying a shotgun." PSR ¶ 5, at 4.

15.    Frodsham loaded the gun and stated, "this is a robbery, you have 30 seconds to fill this bag, or I'll shoot somebody." PSR ¶ 5, at 4.

16.     Frodsham then pointed the gun towards the bank tellers.  See PSR ¶ 5, at 4.

17.     Frodsham threw a gym bag on the counter, and the tellers filled the bag with $7,673.00.  See PSR ¶ 5, at 4.

18.     Frodsham took the bag and fled, leaping over a chain-link fence.  See PSR ¶ 5, at 4.

19.     Frodsham met Shook at the apartment complex, and the two drove to the home of Frodsham's girlfriend, Chrissy Haskins.  See PSR ¶¶ 7, 10, at 4, 5; Shook Aff. ¶ 1-2, at 1.

20.     At Haskins' home, Frodsham gave Shook his share of the money -- $1,500.00.  See PSR ¶ 10, at 5; Shook Aff. ¶ 1-2, at 1.

21.     Frodsham and Haskins kept the remainder of the money.  See PSR ¶ 7, at 4.

**3.     Shook's Arrest, Sentence, and Supervised Release.**

22.     On November 11, 1991, Federal Bureau of Investigations ("FBI") agents arrested Shook and Frodsham.  PSR ¶ 8, at 4.

23.     Both men admitted their involvement in the bank robbery and "provided information regarding other illicit activities in which they had been involved."  PSR ¶ 8, at 4.

24.     Shook told FBI agents:

> Thinking back on what occurred, I can't believe I actually took part in something like this.  This incident forced me to reevaluate my life and make drastic changes in the way I conduct my life.  I have enrolled . . . and am going to take the high school equivalency test so that I may receive a high school diploma.  I am truly sorry for my role in this offense, and I know that this is something I will never do or take part in again.

PSR ¶ 11, at 5.

25.     Shook signed the Plea Agreement on May 4, 1992.  See Plea Agreement at 1; PSR ¶ 2, at 3.

26.     On June 2, 1992, the United States Probation Office ("USPO") prepared the PSR. PSR at 2 (no paragraph numbering).

27.     The USPO calculated an offense level of 6 and a Criminal History Category of I, generating a Guideline imprisonment range of 0 to 6 months.  See PSR ¶ 26, at 7.

28.     Had Shook been found guilty of all the charges listed in the Indictment, he would have had a Guideline range of 46 to 57 months.  See PSR ¶ 51, at 11.

29.     On July 17, 1992, Shook pled guilty to Bank Larceny, see 18 U.S.C. § 2113(b), Aiding and Abetting, see 18 U.S.C. § 2.  See also Plea Agreement at 1; Shook Aff. ¶ 3 at 2.

30.     The Honorable John E. Conway, then-United States District Judge for the United States District Court for the District of New Mexico, adopted "the factual findings and guideline applications in the presentence report . . . ." J&C at 2.

31.     Judge Conway found:

> The Court finds that the offense level is six (6) and the criminal history category is I, establishing a guideline imprisonment range of zero (0) to six (6) months.  The Court takes judicial notice that the defendant drove a getaway car during the armed robbery of a bank, in which $7,673.00 was stolen, Defendant is before the Court for sentencing on a plea to Bank Larceny; he has no prior record, but did accept proceeds from the offense.  The sentence imposed will reflect the sentencing goals of punishment, deterrence, and protection of the public.

J&C at 2.  See Petition at 2; Shook Aff. ¶ 5 at 2.

32.     Judge Conway sentenced Shook to six months of imprisonment.  See J&C at 2.

33.     Judge Conway explained that his "intention is that the defendant serve four (4) months at the La Pasada Halfway House and two months on live out status[1] with electronic

---

[1]The Federal Bureau of Prisons defines "live out status" as:

Home confinement, in several forms, is another community corrections option that can be used effectively in holding non dangerous offenders accountable for their

monitoring."  J&C at 2.

34.     Judge Conway also placed Shook on Supervised Release for three years.  <u>See</u> J&C at 2.

35.     Shook self-surrendered to La Pasada Halfway House on August 31, 1992.  <u>See</u> J&C at 4.

36.     While at La Pasada, Shook was "allowed to attend school and work," and attended school and work.  Shook Aff. ¶ 9, at 2.

37.     Shook complied with his sentence's terms and completed his Supervised Release "without issue."  Shook Aff. ¶ 9, at 2.

**4.      Shook's Life Following his Sentence.**

38.     Since completing his sentence, Shook has "not been arrested for, charged with, or convicted of any other criminal offense."  Shook Aff. ¶ 10, at 2.  <u>See</u> Background Check at 5-6; Petition at 2.

39.     Shook has worked as a plumber for "TLC plumbing in Albuquerque, New Mexico," for seventeen years.  Shook Aff. ¶ 13 at 2.

40.     Shook is a homeowner, has two children, and has a fiancé.  <u>See</u> Shook Aff. ¶ 13-

---

acts. In actuality, Community Corrections Center (CCC) programs have used this approach (calling it "live out" status) for many years.  In this program, inmates spend the final portion of their sentence at home, while still in prisoner status.  By allowing such offenders to leave home only to work at their regular jobs, the Court can require offenders to support their family, pay restitution and court costs, and even pay for the cost of their supervision in the community.  This can, in essence, be a cost-free confinement option for society.  At present, about 100 Federal offenders are in such programs.  A variant of home confinement involves use of electronic monitoring.

Bureau of Prisons, 1989 State of the Bureau 24 (1989).

16 at 2-3.

41.     Shook now wishes to own a firearm for "the limited purpose of defending my home and my family."  Shook Aff. ¶ 13-16 at 2-3.

## **PROCEDURAL BACKGROUND**

On March 13, 2017, Shook requested an expungement of his criminal record on the counts of bank larceny and aiding and abetting to which he had pled guilty on May 4, 1992.  See Petition at 2.  The United States then asked the Court to dismiss the Petition.  See Motion at 10.  The Court held a hearing on August 13, 2019.  See Draft Transcript of Hearing at 1:22 (taken August 13, 2019)("Tr.").[2]

### 1.     **Shook's Petition.**

On March 13, 2017, Shook filed his Petition.  See Petition at 1.  Shook asks for an expungement of "the record [of] a criminal offense" that he committed twenty-five years ago. Petition at 1.  First, Shook argues that, had he been charged under New Mexico state law for an equivalent offense, his firearm ownership rights would already have been restored; however, because he was convicted in federal court, Shook's "remedies appear to be limited."  Petition at 3. Shook contends that "a qualifying pardon or permission" from a federal agency under 18 U.S.C. § 1203(2) or 18 U.S.C. § 925(c) is no longer available to him.  Petition at 3.  Shook then argues that the Tenth Circuit has held that Congress intended to suspend the relief available under 18 U.S.C. § 925(c).  See Petition at 3.  Shook also argues that the Tenth Circuit has held "the fact of an unfunded mandate in the Bureau of Alcohol, Tobacco, and Firearms does not mean that the

---

[2]The Court's citations to the transcript of the hearing in this Memorandum Opinion and Order refers to the Courts reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

federal district courts have jurisdiction to hear similar requests," which bars Shook from seeking a statutory or administrative appeal.  Petition at 3.

Shook then states another potential remedy -- a constitutional challenge to 18 U.S.C. § 922(g)'s firearm restrictions.[3]  See Petition at 4.  Shook cites Binderup v. Attorney General United States of America, 836 F.3d 336 (3d Cir. 2016), in which a felon was able to restore his firearm ownership after a minor felony conviction.  See Petition at 4.  Shook states that, even with analysis from the United States Court of Appeals for the Third Circuit in Binderup v. Attorney General United States of America, 836 F.3d at 341, which "seems tailor-made" for Shook, the "significant amounts of time and money," and the risk of "setting a precedent whereby New Mexico's federal courts are bombarded by a series of expensive, time-consuming as-applied challenges to § 922(g)" makes the challenge against the best interest both of Shook and the Court. Petition at 5.

Shook argues that district courts' power to expunge a criminal record is well established in the Tenth Circuit under United States v. Linn, 513 F.2d 925, 927 (10th Cir. 1975).  See Petition at 5.  Shook then explains the holding from United States v. Linn, 513 F.2d at 928, stating the court has held there is no "all-purpose rule" for expungement, but a district court should adopt a balancing test which balances "the dangers of unwarranted adverse consequences to the individual . . . [against] the public interest in maintenance of the records."  Petition at 5 (citing Bromley v. Crisp, 561 F.2d 1351, 1364 (10th Cir. 1977)).  Shook then explains the facts and holding of United States v. Williams, 582 F. Supp. 2d 1345, 1348 (D. Utah 2008)(Greene, J.), and

---

[3]Section 922(g) states it is unlawful for a person "convicted in any court of, a crime punishable by imprisonment for a term exceeding one year," to possess a firearm or ammunition "that has been shipped or transported in interstate or foreign commerce."

how they are analogous to Shook's situation.  See Petition at 6-7.  Shook argues that United States

v. Williams, 582 F. Supp. 2d 345 at 1348, emphasizes the "importance of an Assistant U.S.

Attorney's support for the petitioner's expungement request," but contends that the lack of support

in Shook's case "should not be dispositive."  Petition at 7.  Shook asserts that United States v.

Linn, 513 F.2d at 927, gives a district court "[d]iscretion to expunge or not expunge" a criminal

record.  Petition at 7.  Shook argues that giving the United States Attorney's office "undue

deference" could undermine the "policy objectives of expungement."  Petition at 7.  Shook then

contends that expungement and firearm ownership rights restoration create a "powerful message

in favor of incentive[s]" to continue to be law-abiding citizens, but if an individual "cannot hope

to receive that incentive, then the incentive is illusory."  Petition at 7.  Shook continues to argue

that, if the courts do not have the discretion to give back fundamental rights, such as firearm

ownership, then "it will create a hopelessness that leads to nihilism and recidivism."  Petition at 7-

8.  Shook contends that, "if the calculus of expungement weighed in favor of the petitioner in

United States v. Williams," Shook should also receive an expungement because of the "nearly

identical facts" even without the agreement of the United States Attorney's Office.  Petition at 8.

Shook concludes by requesting "that all record of his federal felony conviction from 1992 be

expunged, and any other relief that this Court may deem just and proper," because expungement

is "the simplest and most effective way to serve the interests of justice."  Petition at 8.

       **2.**     **The United States' Motion.**

      On March 27, 2017, the United States asked the Court to dismiss the Petition.  See Motion

at 1.  First, the United States concurs with Shook that, based on his 1992 larceny conviction, he is

prohibited from owning a firearm under 18 U.S.C. § 922(g)(1).  See Motion at 2.  The United

States, argues, however that Shook cannot have his record expunged, because he has not

established a right to any relief.  See Motion at 3.  The United States further argues that federal

courts are "courts of limited jurisdiction," and that "either the Constitution or statute must delineate

and convey judicial jurisdiction."  Motion at 3.  The United States contends that "courts cannot

expand their own authority through judicial decree" and insists that the burden of establishing the

judicial authority rests on Shook.  Motion at 3.  The United States maintains that federal courts

have jurisdiction to expunge a conviction under only three circumstances: "when the court has

original jurisdiction; when a statute authorizes expungement of a conviction under certain

circumstances; or when a court has ancillary jurisdiction."  Motion at 3.  The United States argues

that, under 18 U.S.C. § 3231, a federal district court "has original jurisdiction over 'all offenses

against the laws of the United States,'" and this jurisdiction remains until the district court renders

a final judgment.  Motion at 4.  The United States further argues that, under rule 4(a)(4)(A)(i)-(vi)

of the Federal Rules of Appellate Procedure, a district court retains "limited jurisdiction under the

Federal Rule of Criminal Procedure to hear certain post judgment motion," and that Shook has

neither alleged the Court has original jurisdiction "nor has he pointed to a relevant post-judgment

federal rule."  Motion at 4.  The United States then argues that the Court's statutory jurisdiction

"ended with its final judgment and with Shook's completion of his federal sentence," and, thus,

the Court does not have statutory jurisdiction in this case.  Motion at 4.

Next, the United States contends that Shook relies incorrectly on two cases to establish

jurisdiction for his Petition.  See Motion at 5 (citing United States v. Linn, 513 F.2d at 927, and

United States v. Williams, 582 F. Supp. 2d 1345).  The United States argues that United States v.

Williams applied incorrectly United States v. Linn.  See Motion at 5 (citing United States v. Ward,

No. CR 06-0538 CW, 2009 WL 5216861, at *1 (D. Utah Dec. 29, 2009)(Waddoups J.)).  The

United States then argues that United States v. Williams ignores the controlling Tenth Circuit law

under United States v. Pinto, 1 F.3d 1069 (10th Cir. 1993), and asserts that "Shook's arguments are insufficient to establish equitable jurisdiction over this Petition."  Motion at 6.

Next, the United States contends that the Tenth Circuit has not addressed whether district courts have ancillary authority to address Shook's claim.  See Motion at 7.  The United States argues that "at least half of the Circuit courts have considered this issue," concluding they do not have "inherent equitable jurisdiction over expungement petitions because they do not have ancillary jurisdiction over them."  Motion at 7.  The United States further contends that Kokkonen v. Guardian Life Insurance Co. of America, 511 U.S. 375 (1994)("Kokkonen"), explains that ancillary jurisdiction exists for "two separate, though sometimes related purpose," and "under the following circumstances: (1) when necessary to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and/or (2) 'to enable a court to function successfully, that is to manage its proceedings, vindicate its authority and effectuate its decrees.'"  Motion at 7 (quoting Kokkonen, 511 U.S. at 379-80).  Without ancillary jurisdiction, the United States argues, a court lacks inherent jurisdiction.  See Motion at 7.  The United States contends that seven Courts of Appeals "have held that under Kokkonen, 511 U.S. 375, federal courts do not have ancillary jurisdiction to consider expungement based on equitable grounds," and have applied the "Kokkonen test" to civil and criminal cases.  Motion at 8.  The United States asserts the United States Court of Appeals for the Seventh Circuit is the most recent Court of Appeals to "join the First, Second, Third, Sixth, Eighth and Ninth Circuits in concluding that federal courts do not have ancillary jurisdiction over equitable expungement petitions."  Motion at 8 (citing United States v. Wahi, 850 F.3d 296 (7th Cir. 2017)).  The United States contends that the Tenth Circuit has not ruled on Kokkonen and that "[a]rguably, the situs for a court's inherent equitable power with respect to criminal cases does lie within its ancillary jurisdiction.  If so, under

<u>Kokkonen</u>, 511 U.S. 375, there is no basis for expunging a valid conviction."  Motion at 9.  The United States concludes by arguing that Shook has not shown that "this Court has any original, statutory or constitutional jurisdiction for this petition, nor has he established equitable or ancillary jurisdiction."  Motion at 10.

       **3.**       **<u>The Response</u>.**

Shook responds to the Motion, insisting that the "relevant jurisdictional basis . . . lies in the 'inherent equitable powers' of a federal district court."  Response at 1 (citing <u>United States v. Pinto</u>, 1 F.3d at 1069).  Shook contends that the United States misquotes the Tenth Circuit's opinion in <u>United States v. Pinto</u>, 1 F.3d at 1070, and "attempt[s] to turn that opinion into something that it is not: a limitation on a district court's equitable jurisdiction."  Response at 1. Shook argues that <u>United States v. Pinto</u>, 1 F.3d at 1070, addresses only the "Tenth Circuit's jurisdiction to hear the appeal," and there is no discussion on the district court's jurisdiction with respect to an expungement petition.  Response at 1.  Shook further argues that <u>United States v. Pinto</u>, 1 F.3d at 1070, gave a district court the jurisdiction to "address the merits of expungement disputes, but that district courts will only have the power to grant such disputes in rare circumstances."  Response at 2.

Shook then contends that the United States had "no basis" to argue that "<u>United States v. Williams</u>, 582 F. Supp. 2d 1345, 'completely ignored' <u>United States v. Pinto</u>, in granting a petition to expunge," because <u>United States v. Pinto</u> is not the sole Tenth Circuit opinion addressing expungement and <u>United States v. Pinto</u> "stands in stark tension with the holding in <u>United States v. Linn</u>, that 'there appears to be no definitive, all-purpose rule to govern'" expungement requests. Response at 2 (quoting the Motion and <u>United States v. Linn</u>, 513 F.2d at 927).  Shook argues that <u>United States v. Williams</u> addresses the "tension" between <u>United States v. Pinto</u> and <u>United States</u>

v. Linn.  See Response at 2.  Shook asserts that for the United States to argue that "the decision in United States v. Williams 'completely ignored' the holding in United States v. Pinto is as unwarranted as Mr. Shook arguing that the decision in United States v. Pinto 'completely ignored' the precedential holding in United States v. Linn."  Response at 2.  Shook concludes that United States v. Williams "can be reconciled with United States v. Pinto, just as United States v. Pinto can be reconciled with United States v. Linn."  Response at 2.

Shook then contends that his circumstances are  essentially the same as the petitioner's circumstances in United States v. Williams, but asserts that the only "meaningful" difference between the two is the United States' "inexplicable willingness" to support the petitioner in United States v. Williams , although here, the United States does not support Shook's petition.  Response at 3.  Shook further contends that the United States' power to decide which citizens have their "fundamental rights restored" encroaches upon the role of the Court as a "neutral arbiter."  Response at 3.  Shook argues that, if United States v. Pinto, 1 F.3d at 1070, causes the United States to have "concerns about the ability of the district court to expunge convictions," it should have raised these concerns in United States v. Williams, and, if the United States did not have those concerns when the court decided United States v. Williams, the United States should not have them now.  Response at 3.

Shook then argues that the United States asserts incorrectly that Shook "reject[s] the option of a constitutional challenge to 18 U.S.C. § 922(g)," because, although Shook believes that he could be successful in a constitutional challenge to 18 U.S.C. § 922(g), the time and expense of a constitutional challenge "makes the approach far from ideal."  Response at 4 (citing Petition at 5).  Shook contends that the Court would have the jurisdiction over a constitutional challenge to 18 U.S.C. § 922(g); however, because "this Court has both the jurisdiction and the discretion to grant

his Petition," Shook has decided to appeal to "the discretion of this Court in hopes of avoiding the significant time and expense of a Constitutional challenge." Response at 4. Shook concludes by asking the Court to deny the Motion and grant his Petition. See Response at 4.

    **4.**    **The Hearing.**

    The Court held a hearing on August 13, 2019. See Clerks Minutes at 1, filed August 13, 2019 (Doc. 10). The Court asked the United States whether it believes the cases cited in the Motion "talk about lack of jurisdiction," or if the United States would like the Court to dismiss the case based "on the merits." Tr. at 3:15-4:8 (Court). The United States stated that it is a "gray area" whether the Court has jurisdiction, but argued that the Court has neither original jurisdiction nor statutory jurisdiction. Tr. at 4:9-15 (Burkhead). The United States acknowledged that relief would be available to Shook under New Mexico law, had he been convicted in State court, but insisted that there "is no federal statute . . . that permits relief." Tr. at 4:16-19 (Burkhead). The United States then argued that, if the Court has jurisdiction, it would "come under the umbrella of equitable authority, which the cases United States v. Linn, 513 F.2d 925 and United States v. Williams, 582 F. Supp. 2d 1345 talk about," but the distinction in those cases "seem to be if there is equitable authority at all." Tr. at 4:22-5:4 (Burkhead).

    The Court then asked if the "Tenth Circuit cases, . . . use the word jurisdiction." Tr. at 5:7-9 (Court). The United States responded that their "interpretation of it was jurisdiction," but "if you go to United States v. Pinto, 1 F.3d 1070 . . . it is pretty clear . . . under the facts of this case that there is no right to expungement in this case." Tr. at 5:10-17 (Burkhead). The Court noted that the Court has federal-question jurisdiction and that "we have ancillary jurisdiction." Tr. at 5:20-6:8 (Court). The Court noted that it "seems" to have jurisdiction to "entertain their case," but asked for the United States' thoughts whether the Court has the authority to grant Shook's petition.

Tr. at 6:10-16 (Court).  The United States responded that it is unsure "what the vehicle would be under the procedure that the Court just outlined . . . . [T]he defendant hasn't been under [a] loss of liberty that would support a habeas petition."  Tr. at 6:17-21 (Burkhead).  The United States continued by explaining that Shook probably would not satisfy the "requirements of coram nobis" and explained that it is unsure what "vehicle the Court [would] have if [this issue] was presented merely as a federal question."  Tr. at 7:1-8 (Burkhead).  The Court did not "strongly disagree" with the United States, but stated that if "somebody brought a very defective coram nobis claim I still [would] have jurisdiction . . . to hear their claim then enter an order that denied their relief."  Tr. at 7:9-19 (Court).  The United States agreed with the Court, but "imagin[es] [Shook] didn't bring the case as a coram nobis because the requirements are very difficult to meet," which is why Shook brought it under the Court's "inherent authority."  Tr. at 7:20-8:4 (Burkhead).  The Court then asked if either party has found an on-point case from the Tenth Circuit or the Supreme Court "where somebody has sought to seek expungement of criminal records of a criminal conviction."  Tr. at 8:9-14 (Court).  The United States stated that, in "terms of jurisdiction," it has no other cases.  Tr. at 8:16-18 (Burkhead).

The Court then asked if Shook believed the Court had jurisdiction to hear this issue.  See Tr. at 9:1-2 (Court).  Shook responded that he agreed with the United States and that "this is a fuzzy area."  Tr. at 9:2-4 (Monagle).  The Court then asked if Shook believed this expungement was "something in my criminal powers . . . .  [Or] is it a civil case."  Tr. at 9:5-11 (Court).  Shook responded that he believed it is a civil case, and explained that he is seeking "clarification" how a "felony is defined for the purposes of the prohibition of felons owning firearms [under] 18 U.S.C. § 922(g)."  Tr. at 9:17-22 (Monagle).  The Court asked if Shook was seeking a declaratory judgment what 18 U.S.C. § 922(g) means.  Tr. at 9:23-25 (Court).  Shook responded that he is

"speaking more to the federal question jurisdiction aspect," to which the Court asked if Shook is

invoking "the Court's federal question jurisdiction under [a] civil statute." Tr. at 10:1-6 (Monagle,

Court).  Shook responded in the affirmative, and stated that the Tenth Circuit case law on the

"inherent equitable powers" grants the Court power to expunge criminal records in "rare or

extreme circumstances."  Tr. at 10:7-17 (Monagle).  Shook then brought to the Court's attention

United States v. Trzaska, 781 F. App'x 697 (10th Cir. 2019)(Holmes, J.)(unpublished),[4] which

was not in the briefings, because it was issued "very recently"; Shook contended that the new case

"states clearly that United States v. Linn, 513 F.2d 925 . . . is the root of this expungement

jurisdictional line of case law in the Tenth Circuit."  Tr. at 11:1-13 (Monagle).  Shook continued

that:

> [D]espite the Supreme Court's decision in Kokkonen v. Guardian Life Insurance
> Company of America, 511 U.S. 375 . . . [the] Tenth Circuit case law provides a
> basis for that case to be distinguished, . . . therefore the Tenth Circuit in this recent
> case adheres to United States v. Linn and prior cases holding[s] that district courts
> have ancillary jurisdiction to grant expungement for convictions of arrest records.

Tr. at 11:12-21 (Monagle).   The Court asked if United States v. Trzaska treats the Court's

---

[4]United States v. Trzaska, 781 F. App'x 697 (10th Cir. 2019) is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored. However,
> if an unpublished opinion or order and judgment has persuasive value with respect
> to a material issue in a case and would assist the court in its disposition, we allow
> a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Trzaska, and other unpublished cases cited herein, have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

jurisdiction as "ancillary jurisdiction . . . or civil jurisdiction invoking the Court's federal question jurisdiction," and Shook responded that it is not clear in the case.  Tr. at 11:1-12:6 (Court, Monagle).  Shook continued that United States v. Trzaska gives the Court "inherent equitable jurisdiction," but noted that "it does not seem to be a fit in terms of the facts or structure of [this] case."  Tr. at 12:7-23 (Monagle).  The Court then asked if the footnote in United States v. Trzaska talks about ancillary jurisdiction, and Shook responded that it does not address motions to expunge a criminal record or if those motions fall into ancillary jurisdiction, which "kind of . . . acknowledges that this is sort of a free-floating area."  Tr. at 12:24-13:8 (Court, Monagle).  Next, the Court asked Shook if he agrees with the United States that the Court has ancillary jurisdiction, and Shook responded that he believes the "[g]overnment's position with respect to ancillary jurisdiction is correct."  Tr. at 13:9-25 (Court, Monagle).  The Court then clarified with Shook asking if this action is a "civil case and . . . a federal question"; Shook responded that "this is an appeal to an inherent equitable authority that Tenth Circuit case law has recognized without . . . forming any independent basis for jurisdiction beyond federal question jurisdiction."  Tr. at 14:2-10 (Court, Monagle).

The United States then addressed the Petition's merits, explaining that the case's merits "should be a much easier question for the Court than the jurisdictional question," because United States v. Pinto, 1 F.3d 1069 addressed "almost identical facts."  Tr. at 15:2-6 (Monagle).  The United States argued that Shook is not attacking "his underlying conviction," but instead he is saying "he has lived an honorable life . . . [and] because of that he should be able to now own a gun [but] unfortunately . . . the law does not support that."  Tr. at 16:2-8 (Burkhead).  The United States asserted that United States v. Pinto, does not support expungement "without an allegation of some support of underlying misconduct," and, because Shook has based his complaint solely

- 17 -

on "the inconvenience [of] having a felony" the Court should deny his petition.  Tr. at 16:9-14 (Burkhead).

The Court asked Shook what standard the Court should follow.  See Tr. at 16:24-25 (Court).  Shook responded that the case law demonstrates the standard is "rare and extreme."  Tr. at 17:2-5 (Burkhead).  The Court then asked Shook what rare circumstances the Tenth Circuit is seeking.  See Tr. at 17:7-9 (Court).  Shook responded that there is "some sort of law or constitutional failing in the original conviction" in many circumstances, but United States v. Williams is "very factually similar to the case at hand . . . [and] one of the major reasons that we . . . fil[ed] the petition for expungement."  Tr. at 17:10-17 (Monagle).  The Court asked Shook what relief he wants, because the Court cannot "go down to the Court records and tear something up . . . .  [Do] you . . . want me to declare restitution for his firearm rights?"  Tr. at 17:21-18:8 (Court).  Shook responded that expungement carries rights of restitution under "various federal statutes," and expungement is "one of the enumerated methods for no longer being classified as felon under the firearms prohibition statute."  Tr. at 18:10-19 (Monagle).  The Court asked if Shook is content with an order of expungement, even if it means his criminal history still will appear on background checks.  See Tr. at 18:20-25 (Court).  Shook responded that an expungement order from the Court would declare Shook is "no longer a felon for purposes of the firearms prohibition statute."  Tr. at 19:1-3 (Monagle).

The Court then asked Shook to explain the merits of United States v. Williams.  See Tr. at 19:4-5 (Court).  Shook compared the similarities between the facts in United States v. Williams and Shook's circumstances, arguing that both the petitioner in United States v. Williams and Shook lived law-abiding lives since their convictions, and insisted that living a law-abiding life for twenty years with a felony conviction stands as a "particularly unique circumstance . . . that justified the

Court's use of its inherent equitable power to expunge."  Tr. at 19:6-20:3 (Monagle).  Shook continued that a constitutional challenge to the life-long prohibition on firearms for felons would be his other option, but, because such an argument is "potentially messy," Shook contended an expungement is the best option.  Tr. at 20:8-22 (Monagle).  Shook asked that, if the Court does not decide this issue on jurisdictional grounds, for an evidentiary hearing to "lay out in detail" how he has lived his life and how his conviction has affected his "life and restricted his rights over those twenty-five years."  Tr. at 21:1-11 (Monagle).  The Court asked for clarification how an evidentiary hearing would help Shook later in an applied constitutional challenge.  See Tr. at 21:12-21 (Court).  Shook responded that the Third Circuit allowed an evidentiary hearing for individuals like Shook "who have exhausted their other options in pursuing the restoration of their rights."  Tr. at 21:22-22:10 (Monagle).  Shook contended that an evidentiary hearing, therefore, would help by "laying everything out on the record" and having the "government explain why this case is distinct from United States v. Williams."  Tr. at 22:11-18 (Monagle).

The Court then asked the United States if they had anything else to say on the matter.  See Tr. at 23:3-5 (Court).  The United States responded that they "can't speak to why a federal prosecutor eleven years ago in United States v. Williams," decided to support Mr. Williams' expungement petition, but Shook should not benefit from a "prosecutor, who, eleven years ago failed to read Tenth Circuit applicable law."  Tr. at 23:6-14 (Burkhead).  The United States argued that, if the Court grants this petition, "every defendant" will be able to get his or her record expunged, because "one federal prosecutor in one jurisdiction one decade ago failed to crack open the federal statutes and the federal law."  Tr. at 23:14-18 (Burkhead).  The United States contended that United States v. Williams is an "outlier case" that relies only upon United States v. Linn, a case that did not cite United States v. Pinto; the United States therefore argued that the "Court

should not rely on" United States v. Williams, but instead should rely "on the law as set forth in United States v. Pinto." Tr. at 23:22-24:3 (Burkhead).

The Court noted that it "tends to agree with" the United States on the case's merits, but had concerns about declaring that "certain cases are wrong,"; the Court also noted that "I could not imagine . . . object[ing] to an affidavit." Tr. at 24:23-25:22 (Court). The Court then stated that "I think I am going to have jurisdiction, but I also do not think I am going to find that this is an extraordinary [or] rare type of case that I should grant relief." Tr. at 26:3-22 (Court). The Court continued that, if the Court grants relief here, "[i]t would be more routine for people that behave themselves for twenty years" to petition the Court for expungement. Tr. at 26:3-22 (Court). The Court asked Shook if he would like to introduce an affidavit to demonstrate that Shook's circumstances are extraordinary or rare; Shook replied that he would submit the affidavit. See Tr. at 27:8-11 (Court, Monagle). The Court then told Shook to "send in the affidavit," but the Court was not optimistic in "grant[ing] any relief," because the Court was unsure if "the law allows it here." Tr. at 27:12-28:9 (Court, Monagle).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Federal courts "possess only that power authorized by Constitution and statute." Kokkonen, 511 U.S. at 377.[5] Among the powers that Congress has bestowed upon the courts is the power to hear

---

[5]Rule 41(a)(2) of the Federal Rules of Civil Procedure, which governs all dismissals undertaken by way of a court order, grants courts discretion to condition dismissal "on terms that the court considers proper," Fed. R. Civ. P. 41(a)(2), formerly, "on terms and conditions as the court deems proper," Smith v. Phillips, 881 F.2d 902, 904-05 (10th Cir. 1989)(quoting Fed. R. Civ. P. 41(a)(2) (1988)). Such conditions "could include retention of some jurisdiction by the court." Smith v. Phillips, 881 F.2d at 905 (citing McCall-Bey v. Franzen, 777 F.2d 1178, 1188-

controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.  See 28 U.S.C. §§ 1331-32.  Section 1367 additionally grants the federal courts power to hear claims over which the court lacks original jurisdiction, if those claims are part of the same constitutional case as claims over which the court has original jurisdiction.  See 28 U.S.C. § 1367(a).

---

90 (7th Cir. 1985)).  The Tenth Circuit has stated that, if the dismissal is pursuant to rule 40(a)(1)(A)(ii), undertaken without a court order, then the court "is powerless to condition dismissal . . . upon a retention of jurisdiction."  Smith v. Phillips, 881 F.2d at 905.  This rule is likely no longer true; the district court can probably attach a condition retaining jurisdiction, but only if the parties agree.

> Even when . . . the dismissal is pursuant to Rule 41(a)(1)(ii) [(now rule 41(a)(1)(A)(ii))] (which does not by its terms empower a district court to attach conditions to the parties' stipulation of dismissal) we think the court is authorized to embody the settlement contract in its dismissal order or, what has the same effect, retain jurisdiction over the settlement contract) [sic] if the parties agree.

Kokkonen, 511 U.S. 375, 381-82 (1994).

The only factors counseling hesitation in endorsing the view that a court may retain jurisdiction of a case dismissed pursuant to rule 41(a)(1)(A) are that: (i) the proclamation in Kokkonen was dicta, and "[i]t is to the holdings of [the Supreme Court's] cases, rather than their dicta, that we must attend," 511 U.S. 375, 379; and (ii) the Court refers to "embody[ing] the settlement contract in its dismissal order," but rule 41(a)(1)(A) provides -- in its very title -- that it pertains to dismissals effectuated *Without a Court Order*," Fed. R. Civ. P. 41(a)(1)(A) (emphasis in original).  Smith v. Phillips must, however, be interpreted in light of the Supreme Court's subsequent decision in Kokkonen, 511 U.S. 375 (1994), in which the Supreme Court held that a district court's ancillary jurisdiction does not extend to the post-dismissal enforcement of federal case settlement agreements, unless: (i) there is an independent basis of federal subject-matter jurisdiction to hear the claims; (ii) the court incorporated the terms of the settlement agreement into its order of dismissal; or (iii) the court includes a term "'retaining jurisdiction'" in its order of dismissal.  Kokkonen, 511 U.S. at 381.  That decision continues to permit district courts to condition dismissals under rule 41(a)(2), see 511 U.S. at 381, and appears to have no bearing on courts' power to reopen cases pursuant to rule 60(b), see 511 U.S. at 378 (noting, without opining on, the practice of "[s]ome Courts of Appeals" to "reopen[ ] . . . dismissed suit[s] by reason of breach of the agreement that was the basis for dismissal").

1.      **Congressional Authority to Exercise Supplemental Jurisdiction**.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.  The Supreme Court of the United States of America has long subscribed to the concept of supplemental jurisdiction recognized in two common-law doctrines, pendent jurisdiction[6] and ancillary jurisdiction[7]; section 1367's passage codified those jurisdictional forms, and also allowed courts to hear cases under pendent-party jurisdiction, which the Supreme Court had previously disallowed in Finley v. United States, 490 U.S. 545 (1989). Federal courts may exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from a common nucleus of operative fact."  United Mine Workers v. Gibbs, 383

---

[6]"Traditionally, pendent jurisdiction involved claims by plaintiffs, usually in a federal question case, and ancillary jurisdiction involved claims by parties other than plaintiffs, usually in a diversity of citizenship case.  In 1990, Congress passed the supplemental jurisdiction statute, 28 U.S.C. § 1367, which codified the topic under the generic rubric of "supplemental jurisdiction."  § 3523.1 Discretionary Character of Ancillary, Pendent, and Supplemental Jurisdiction, 13 Fed. Prac. & Proc. Juris. § 3523.1 (3d ed.).  "Pendent jurisdiction is a 'court's jurisdiction to hear and determine a claim over which it would not otherwise have jurisdiction, because the claim arises from the same transaction or occurrence as another claim that is properly before the court.'"  Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1306 n.10 (D.N.M. 2015)(Browning, J.)(quoting Black's Law Dictionary 930 (9th ed. 2009)).

[7]"Ancillary jurisdiction is a 'court's jurisdiction to adjudicate claims and proceedings related to a claim that is properly before the court.'"  Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1306 n.9 (D.N.M. 2015)(Browning, J.)(quoting Black's Law Dictionary 928 (9th ed. 2009)).

U.S. 715, 725 (1966)("Gibbs").  Supplemental jurisdiction gives federal courts the flexibility to

hear a cause of action after the introduction of third parties, whose insertion into the litigation does

not have the support of any independent grounds for federal jurisdiction, when those parties share

a common interest in the outcome of the litigation and are logical participants in it.  See Owen

Equip. & Erection Co. v. Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court,

created the Federal Courts Study Committee to analyze the federal court system and to recommend

reforms.  See Federal Courts Study Committee, Judicial Conference of the United States Federal

Courts Study Committee, https://www.fjc.gov/content/report-federal-courts-study-committee-0.

In response to the Committee's findings regarding pendent, ancillary, and pendent-party

jurisdiction, Congress codified the doctrines when it passed the Judicial Improvements Act of

1990:

> [I]n any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original jurisdiction that they form part
> of the same case or controversy under Article III of the United States Constitution.
> Such supplemental jurisdiction shall include claims that involve the joinder or
> intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal courts

"supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on

claim and party joinder to deal economically -- in single rather than multiple litigation -- with

matters arising from the same transaction or occurrence."  Report of the Federal Courts Study

Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

## 2.   The District Courts' Discretion to Exercise Supplemental Jurisdiction.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental

jurisdiction as a matter of judicial discretion rather than as a litigant's right.  See Estate of

Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing

City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  The traditional analysis, based

on the Supreme Court's opinion in Gibbs, compelled courts to consider "judicial economy,

convenience and fairness to litigants" when deciding whether to exercise supplemental

jurisdiction.  383 U.S. at 726.

Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the

court should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which
the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original
jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for
declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental

jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity."

Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.  Numerous courts

have acknowledged that 28 U.S.C. § 1367(c) necessarily changes the district courts' supplemental

jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists,

courts are not free to decline jurisdiction.  See Exec. Software N. Am. v. U.S. Dist. Ct., 24 F.3d

1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-

(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the

court's identification of a factual predicate that corresponds to one of the section 1367(c)

categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . ."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Loc. Union No. 1505, 252 F. Supp. 3d 1132, 1152 (D.N.M. 2017)(Browning, J.)("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").  Similarly, other district courts in the Tenth Circuit have come to the same conclusion regarding 28 U.S.C. § 1367(c).  See Gorenc v. Proverbs, 462 F. Supp. 3d 1137, 1159 (D. Kan. 2020)(Crabtree J.)(concluding that "1367(c)(3) is not triggered until the court has dismissed all federal claims against all defendants that form part of the same case or controversy as the state law claims"); Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.")(quoting Exec. Software v. United States District Court, 24 F.3d 1545, 1557 (9th Cir. 1994)).

Under 28 U.S.C. § 1367(c)(3), district courts can decline to exercise supplemental jurisdiction if the district court has dismissed all claims over which it has original jurisdiction. "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228,

1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151,

1156 (10th Cir. 1998)).  That conclusion is consistent with the Supreme Court's statement that

> [n]eedless decisions of state law should be avoided both as a matter of comity and
> to promote justice between the parties, by procuring for them a surer-footed reading
> of applicable law.  Certainly, if the federal claims are dismissed before trial, even
> though not insubstantial in a jurisdictional sense, the state claims should be
> dismissed as well.

Gibbs, 383 U.S. at 726 (footnote omitted).

The Tenth Circuit has recognized that a district court does not abuse its discretion when it

declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C.

§ 1367(c)(3) . . . where it has dismissed all claims over which it has original jurisdiction."  Muller

v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011).  The Tenth Circuit has recognized that a

district court does not abuse its discretion when it declines to exercise supplemental jurisdiction

over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it has dismissed all claims over which it has

original jurisdiction."  Muller v. Culbertson, 408 F. App'x at 197.  The Court has stated previously

that a district court usually should decline to exercise supplemental jurisdiction when 28 U.S.C.

§ 1367(c) applies.  See Armijo v. New Mexico, CIV 08-0336 JB/ACT, 2009 WL 3672828 at *4

(D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only

acknowledged such a result, they have encouraged it.").  The Court consistently has declined to

exercise supplemental jurisdiction when it dismisses all of a case's federal claims with prejudice.

See, e.g., Gutierrez v. Geofreddo, No. CIV 20-0502 JB/CG, 2021 WL 1215816, at *26 (D.N.M.

Mar. 31, 2021)(Browning, J.)(remanding state law claims where the Court "has dismissed the

federal claims here at the motion to dismiss stage"); McGarry v. Bd. of Cty. Commissioners for

Cty. of Lincoln, 294 F. Supp. 3d 1170, 1206 (D.N.M. 2018)(Browning, J.)("The only remaining

claim before the Court is McGarry's NMTCA claim. . . .  The Court declines to exercise

supplemental jurisdiction over that claim."); Parrish v. Roosevelt Cty. Board of Cty. Comm'rs, No. CIV 15-0703 JB/GJF, 2017 WL 6759103, at *20 (D.N.M. Dec. 31, 2017) at *20 (D.N.M. Dec. 31, 2017)(Browning, J.)("The Court declines to exercise supplemental jurisdiction over Parrish's remaining state-law breach-of-contract claim."); Martinez v. Guadalupe Cty., 200 F. Supp. 3d 1216, 1265 (D.N.M. 2016)(Browning, J).  The Court however, also has declined to dismiss state law claims when it dismisses a party's federal claims without prejudice.  See Young v. City of Albuquerque, 77 F. Supp. 3d 1154, 1189 (D.N.M. 2014)(Browning, J.)("[T]he Court would normally remand those [state law] claims to state court. To give the Plaintiffs an opportunity to amend the Complaint to add federal claims against Dear and any other individuals, however, the Court will not remand the state-law claims to state court at this point.").

### 3.    Whether the Issue Raises a Novel or Complex Issue.

Under 28 U.S.C. § 1367(c)(1), a district court "may decline to exercise supplemental jurisdiction over a claim" if "the claim raises a novel or complex issue of state law."  28 U.S.C. § 367(c)(1).  What makes a state law issue novel is unclear from binding Tenth Circuit caselaw. See, e.g., Roe v. Cheyenne Mountain Conf. Resort, Inc., 124 F.3d 1221, 1236-37 (10th Cir. 1997)(not distinguishing between "novel" and "complex," and dismissing a state law claim on § 1367(c)(1) grounds and because no federal law claims remained); Anglemyer v. Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995)(dismissing a state law claim as novel and complex, because a plaintiff alleged a violation of the Kansas Risk Management Act, Kan. Stat. Ann. § § 65-4921 to 4940).[8]  A discernible test for novelty is also not apparent from studying Professors

---

[8]The Tenth Circuit concluded that the issue was novel and complex without elaborating a test, writing:

Charles Alan Wright and Arthur Miller's Federal Practice and Procedure.  See generally 13D

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3567.3, at 417-421 n.

60-61 (3d. ed. 2021)(collecting cases).  The only general rule that Professors Wright and Miller

recognize for the novelty test is that, "[a]s a general matter, common law contract and tort claims

do not present novel or complex questions of state law."  13D Wright & Miller, supra § 3567.3, at

417 n.60.  See, e.g., Blakely v. United States, 276 F.3d 853 (6th Cir. 2002)("This case does not

present complex or novel issues of state law. It involves a fraud claim.").  But cf. Wallin v. Dycus,

224 F. App'x 734, 740 (10th Cir. 2007)(unpublished), as amended nunc pro tunc (March 5,

2008)(affirming a district court for dismissing a state law claim as novel, because it required the

court to determine whether Colorado law recognized that a jailer owed a duty of care to protect a

prisoner's health in tort).  Otherwise, they acknowledge a hodgepodge of different factors that

federal courts have found operative when considering whether a claim is novel.  See 13D Wright

& Miller, supra § 3567.3, at 417 n.60 (citing Dream Palace v. Cty. of Maricopa, 384 F.3d 990,

1022 (9th Cir. 2004)(determining a state issue was novel, because it concerned "issues of the

balance of power between state and local authorities in Arizona"); Wilson v. PFS, LLC, 493

F. Supp. 2d 1122, 1126 (S.D. Cal. 2007)(Hayes, J.)(finding an issue novel or complex, because

there is conflicting state law interpretations of the law); Arpin v. Santa Clara Valley Transp.

Agency, 261 F.3d 912, 927 (9th Cir. 2001)(concluding novelty existed, because it raised "an issue

---

However, we do not have to decide whether the court insufficiently took the extent
of the pretrial proceedings into consideration because there is an independent
reason for dismissing Ms. Anglemyer's pendent state claims. In her complaint
(Count III), she alleged the hospital violated the Kansas Risk Management Act. We
believe the Kansas courts are the appropriate forum to decide this novel and
complex issue of state law.

Anglemyer v. Hamilton Cty. Hosp., 58 F.3d 533, 541 (10th Cir. 1995).

of first impression as to how [a state law] provision is to be applied"); Kadetsky v. Egg Harbor Tp.

Bd. of Educ., 164 F. Supp. 2d 425, 437 (D.N.J. 2001)(Orlofsky, J.)(concluding an issue novel,

because it turned on "application of a recent change in New Jersey state law"); Rockey v. Courtesy

Motors, Inc., 199 F.R.D. 578, 596 (W.D. Mich. 2001)(Scoville, M.J.)(concluding an issue is novel,

because "there is not a single published state-court opinion on point"); Doe v. Sundquist, 106 F.3d

702, 708 (6th Cir. 1997)(concluding an issue was novel, because it involved interpretation of the

state constitution and a new state statute)). See also 13D Wright & Miller, supra § 3567.3, at 416

("Occasionally, a court appears to decline supplemental jurisdiction simply because the

supplemental claim involves questions of state law.").   Some courts, however, have ignored one

or more of these factors.   See e.g., Schwarm v. Craighead, 233 F.R.D. 655, 659 (E.D. Cal.

2006)(Shubb, J.)(exercising supplemental jurisdiction, even though California courts had not yet

interpreted the statute at issue, because "the court here faces a single unexceptional question of

statutory interpretation"); Hunter by Conyer. v. Estate of Baecher, 905 F. Supp. 341, 343 (E.D.

Va. 1995)(Clarke, J.)("It is true that state caselaw concerning the [Virginia Residential Landlord

and Tenant Act, Va. Code Ann. §§ 55-248.2 to 248.50] generally and in the lead paint context

specifically is sparse.   Nevertheless, the lack of caselaw does not make the VRLTA unintelligible

to this Court.").   Perhaps recognizing that what is novel is unfixed, Wright and Miller note that

"each case is decided on its own facts."   13D Wright & Miller, supra § 3567.3, at 417-18.   See id.

at 400 n.27 (citing Karen Nelson Moore, The Supplemental Jurisdiction Statute: An Important but

Controversial Supplement to Federal Jurisdiction, 41 Emory L.J. 31, 62-63 (1992)("In particular,

it may be relatively easy for a district judge to conclude that a novel or complex issue of State law

is involved and to exercise essentially unreviewable discretion to dismiss such a claim.")).   This

uncertainty is not helpful for litigants.   Cf. Teague v. Lane, 489 U.S. 288, 332 (1989)(Brennan, J.,

dissenting)(noting that "predictability in the law" permits "litigants and potential litigants" to act with knowledge, and with assurance that "they will not be treated unfairly as a result of frequent or unanticipated changes in the law"). The Court, accordingly, deems it prudent to outline a test for 28 U.S.C. § 1367(c)(1)'s novelty requirement.[9]

The origin of 28 U.S.C. § 1367(c)(1) is rooted in the seminal <u>Gibbs</u>, 383 U.S. 715 (1966)("<u>Gibbs</u>"). In that case, the Supreme Court created a two-part test for what was then known as pendent jurisdiction. <u>See</u> <u>Gibbs</u>, 383 U.S. at 725. The test's first consideration turned on constitutional concerns -- the federal court's subject-matter jurisdiction over the state claim. <u>See</u> <u>Gibbs</u>, 383 U.S. at 725. To satisfy that constitutional requirement, the Supreme Court determined that "the state and federal claims must derive from a common nucleus of operative fact." <u>See</u> <u>Gibbs</u>, 383 U.S. at 725. The test's second part turned on more pedestrian but nonetheless important practical concerns. <u>See</u> 383 U.S. at 726. The "justification" in exercising jurisdiction "lies in

---

[9]28 U.S.C. § 1367(c)(1)'s novelty and complexity requirements are separate tests -- that is, "novel or complex" is disjunctive, so it should not be read as "novel and complex." 28 U.S.C. § 1367(c)(1). <u>See</u> <u>Ameritox, Ltd. v. Millennium Labs., Inc.</u>, 803 F.3d 518, 536 n.27 (11th Cir. 2015). The United States Court of Appeals for the Eleventh Circuit has written:

> Additionally, § 1367(c)(1) grants district courts the discretion to decline to exercise supplemental jurisdiction if the claim raises a novel *or* complex issue of State law. Thus, even if the claims were not complex -- and they are complex -- the claims' novelty would be sufficient to vest the District Court with discretion.

<u>Ameritox, Ltd. v. Millennium Labs., Inc.</u>, 803 F.3d at 536 n.27 (emphasis in original). The plain meaning of both words also supports that conclusion. Novel, as explored below, generally means new or perhaps notably new. <u>See</u> <u>infra</u>, 36-37. Complex on the other hand, typically means complicated, involved, intricate, or not easily analyzed. <u>See</u> <u>Oxford English Dictionary</u> (online ed. 2018)(defining complex as "consisting of parts or elements not simply co-ordinated, but some of them involved in various degrees of subordination; complicated, involved, intricate; not easily analysed or disentangled"). Something can easily be new without being complicated. With these divergent meanings, it is unlikely that Congress meant for those words to be read together to form one test.

considerations of judicial economy, convenience and fairness to litigants." 383 U.S. at 726.  Thus, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law." Gibbs, 383 U.S. at 726 (citing Strachman v. Palmer, 177 F.2d 427, 437 (1st Cir. 1949)(Macgruder, C.J., concurring)("Federal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation.")).  The Supreme Court's thought is that state courts either are more adept at adjudicating state law matters or, as a matter of respecting our federal system, state sovereigns -- where possible, convenient, and just -- should decide state law matters.  See Gibbs, 383 U.S. at 726.

Congress' enactment of 28 U.S.C. § 1367 supersedes Gibbs, at least in part.  See Wright & Miller supra, § 3567.3, at 400 ("These statutory factors do not completely mesh with the examples provided in Gibbs.").  See also Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546.  The underlying practical considerations animating Gibbs, however, appear to remain intact.  See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164 ("Seeking to vindicate values of economy, convenience, fairness, and comity underlying the judicially-created doctrine of pendent jurisdiction, Congress granted statutory authority to district courts to hear claims that form part of the same case or controversy.").  The Court proceeds, accordingly, with those considerations of economy, convenience, fairness, and comity in mind.

Black's Law dictionary does not define novel.  See Black's Law Dictionary 1169 (11th ed. 2019).  It is more a colloquial word for new than a legal word.  See Pac. Operators Offshore, LLP v. Valladolid, 565 U.S. 207, 223 (2012)(Scalia, J., dissenting)("Substantial nexus is novel legalese with no established meaning in the present context."); Sch. Dist. of Abington Tp. v. Schempp, 374 U.S. 203, 304 (1963)("The principles which we reaffirm and apply today can hardly be thought

novel or radical.  They are, in truth, as old as the Republic itself.").  In this context, however, the Court concludes that novel cannot mean only new, because such a meaning would make supplemental jurisdiction completely discretionary and § 1367(c)'s plain language does allow that expansive meaning.  See 28 U.S.C. § 1367(c).  Every case is new in some way.  There are, at least, always new parties and new facts, and thus the legal analysis is also new for every case, as how the law applies to those facts must be new.  See McGarry v. Board of Cty Comm'rs for Cty. of Lincoln, 294 F. Supp. 3d at 1188 n.13 ("Cases differ.  Many cases, such as this one, have so many facts that are unlikely to ever occur again in a significantly similar way.").  Thus, if newness, alone, is the test, courts would always or almost always have discretion to decline supplemental jurisdiction, which cannot be the test.  See Moore, The Supplemental Jurisdiction Statute: An Important but Controversial Supplement to Federal Jurisdiction, 41 Emory L.J. at 62-63.

Novel does not just mean new, however.  See Oxford English Dictionary (online ed. 2018)(defining novel as "interestingly new or unusual") available at http://www.oed.com/view/Entry/128758?rskey=g8PS24&result=2&isAdvanced=false#eid; Merriam-Webster, (online ed. 2018)(defining novel as "original or striking especially in conception or style") available at https://www.merriam-webster.com/dictionary/novel?src=search-dict-hed.    Novel, accordingly, means both new and noteworthy.  Some of the cases construing novel have attuned to that noteworthy component.  See Dream Palace v. Cty. of Maricopa, 384 F.3d at 1022 (determining a state issue was novel, because it concerned "issues of the balance of power between state and local authorities in Arizona"); Doe v. Sundquist, 106 F.3d at 708 (concluding an issue was novel, because it involved interpretation of the State constitution).  Interpreting a State constitution, the State's controlling document, especially on a matter that a State court has not yet considered, would matter a great deal to that sovereign.  Similarly, adjudicating a new issue which upsets the

balance of power between the State and local authorities would be of great importance to that State. In contrast, a regular tort claim, albeit with new issues, might be of less concern to the state, especially if the litigants are private actors. To be sure, a district court's ruling is binding only on the parties and can be persuasive authority only in subsequent cases. That limitation does not mean, however, that State courts would not want to decide the issue first. A first reasoned decision in an area of law can act as a powerful anchor to a position or a legal rule, requiring litigants opposed to that position to overcome it -- both in court and in settlement negotiations.

With those thoughts in mind, the Court concludes that a State law issue is novel when it is: (i) new; and (ii) concerns a notable State matter. This test is subject to a sliding scale. If a case merely has new facts, but the Court is equipped with settled caselaw, the Court is unlikely to determine that there is a novel issue even if it involves a high-stakes State matter. For example, if the Court is confronted with a State constitutional issue that involves original facts, the Court will not deem the issue novel if the Supreme Court of New Mexico has interpreted the State constitutional provision at issue. The Court also is unlikely to conclude an issue is novel, merely because there are no State court cases interpreting a relevant statute. While such a scenario might be sufficiently new under the first prong of the Court's test, any given State statute does not necessarily concern a sufficiently notable State matter. If, for example, statutory interpretation would require the court only to determine the rights or duties between private parties, such as when the Court is interpreting a statute like the Uniform Commercial Code, the Court is less likely to find the issue a notable State matter. If, on the other hand, the outcome of the Court's statutory interpretation would greatly affect the balance of power between State and local authorities, the Court is more likely to determine that a matter is notable.

The Court deems that this test is appropriate, as it not only accounts for 28 U.S.C.

§ 1367(c)(1)'s meaning of novel, but also respects the federalism and comity considerations that Gibbs articulated.  See Gibbs, 383 U.S. at 726 ("Needless decisions of State law should be avoided both as a matter of comity and to promote justice between the parties by procuring for them a surer-footed reading of applicable law.").  The State sovereign would be less concerned with a federal court deciding a State issue that has limited impact on a State law's application or meaning, but would be more concerned if the federal court's determination skews the State's jurisprudence on a significant State issue for years to come.  Those considerations are especially significant when the issue is currently being litigated in State courts.  See Rhines v. Weber, 544 U.S. 269, 274 (2005)(defining comity as the principle that "one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigations, have had an opportunity to pass on the matter"); Harjo v. City of Albuquerque, 307 F. Supp. 3d 1163, 1222 (D.N.M. 2018)(Browning, J.)(concluding that the issue of whether the New Mexico Forfeiture Act preempts the City of Albuquerque's forfeiture ordinance "is sufficiently new, because no New Mexico appellate courts have considered the issue" is "sufficiently notable" because its determination "bucks the trend amongst state district court judges who concluded that the NMFA does not preempt the Forfeiture Ordinance and the Court's ruling implicates the power local authorities have vis-à-vis the state.").  The Court, accordingly, adopts the foregoing test for the word "novel."

## LAW REGARDING CORAM NOBIS

The writ of coram nobis "was available at common law to correct errors of fact."  United States v. Morgan, 346 U.S. 502, 507 (1954).  Today, the All-Writs Act, 28 U.S.C § 1651, provides federal courts jurisdiction to grant relief in the form of a writ of error coram nobis.  See United States v. Morgan, 346 U.S. at 507.  A writ of error coram nobis affords a remedy to attack a

conviction when the petitioner has served his sentence and is no longer in custody.  See United States v. Kwan, 407 F.3d 100 5, 1011 (9th Cir. 2005).  Coram nobis is an "extraordinary remedy" available "only under circumstances compelling such action to achieve justice."  United States v. Morgan, 346 U.S. at 511.  Before a court may grant a writ of coram nobis: (i) a petitioner must satisfy his or her burden of demonstrating that he or she was duly diligent in bringing a claim; (ii) all other remedies and forms of relief, including post-conviction relief under 18 U.S.C. § 2255, are unavailable or inadequate; and (iii) the requested writ either must correct errors resulting in a complete miscarriage of justice or be under circumstances compelling such action to achieve justice.  See Embrey v. United States, 240 F. App'x 791, 793 (10th Cir. 2007)(unpublished); Klein v. United States, 880 F.2d 250, 254 (10th Cir. 1989).   A defendant must show: (i) that there was an fact error; (ii) that the fact was unknown at the time of trial; and (iii) that the fact is of a fundamentally unjust character which would have altered the outcome of the challenged proceeding had it been known.  See United States v. Donjuan, 720 F. App'x 486, 489 (10th Cir. 2018)(unpublished); Klein v. United States, 880 F.2d at 254.

To show due diligence in bringing a claim, a coram nobis petitioner must provide sound reasons explaining why a petitioner did not attack their sentences or convictions earlier.  See United States v. Morgan, 346 U.S. at 512; United States v. Thody, 460 F. App'x 776 (10th Cir. 2012)(unpublished)("He cannot demonstrate diligence in pursuing his claim when he waited 15 years after the Supreme Court's decision in Bailey v. United States, 516 U.S. 137 (1995), to file his petition."); Klein v. United States, 880 F.2d at 254 (holding that the petitioner failed to exercise due diligence after he waited seven years to bring his coram nobis petition.); United States v. Gaddis, 200 F. App'x 817, 818 (10th Cir. 2006)(affirming the district court's denial of the petitioner's motion for a wait of coram nobis after he waited "almost two years after his release

from prison to file the motion[,] [the petitioners only reason] was that he had been unable to find an attorney to represent him"). With the exception of actual innocence, courts have not elaborated on what constitutes "sound" or "valid" reasons for delay, although courts have described circumstances that provide valid reasons for delay. See e.g., United States v. Gonzalez, CR 03-20136-01-KHV, 2016 WL 2989146 (D. Kan. May 24, 2016)(Vratil J.)(holding that the "defendant's lack of diligence in pursing his claim does not bar the present motion for a writ of coram nobis"); United States v. Peter, 310 F.3d 709, 712 (11th Cir. 2002)(explaining that a "writ of error coram nobis acts as assurance that deserved relief will not be denied because of technical limitations of other post-conviction remedies."); Restrepo v. United States, CIV 12-3517 JBS, 2012 WL 5471151, at *9 (D.N.J. Nov. 8, 2012)(Simandle J.)("[actual innocence constitutes] extraordinary case that [can] negate . . . procedural default [of coram nobis petition]."). Courts have denied relief where the coram nobis petitioner has delayed for no reason whatsoever, where the respondent demonstrates prejudice, or where the petitioner appears to be abusing the writ. See Martinez v. United States, 90 F. Supp. 2d 1072, 1075-77 (D. Haw. 2000)(Kay J.)(denying relief where the petitioner attacked a six-year-old conviction on grounds of speedy trial violations, failed to collaterally challenge the conviction while in custody and until six years after receiving an enhanced sentence for a subsequent conviction); Klein v. United States, 880 F.2d at 254 (denying relief where the petitioner delayed seeking coram nobis relief for seven years without an explanation, the delay caused prejudice to the government because a key witness died, and the petitioner was raising claims that had already been litigated); United States v. Correa-De Jesus, 708 F.2d 1283, 1286 (7th Cir. 1983)(denying relief where the petitioner waited sixteen years to re-litigate claim that he had raised and then dropped on direct appeal); Maghe v. United States, 710 F.2d 503, 503-04 (9th Cir. 1983)(denying relief where the petitioner delayed for twenty-five years

and offered no explanation for doing so).  Additionally, where petitioners reasonably could have asserted the basis for their coram nobis petition earlier, they have no valid justification for delaying pursuit of that claim.   See United States v. Ballard, 317 F. App'x 719, 722 (10th Cir. 2008)(unpublished).  If petitioners did not have a reasonable chance to pursue their claim earlier because of the specific circumstances they faced, delay during the time when such circumstances existed may be justified.  See Hirabayashi v. United States, 828 F.2d 591, 605 (9th Cir. 1987); United States v. Kwan, 407 F.3d 1005, 1015 (9th Cir. 2005).

A coram nobis petitioner shows that a more usual remedy is not available by establishing that the petitioner is not in custody and, as a result, is ineligible for habeas relief or § 2255 relief. See United States v. Miles, 923 F.3d 798, 802 (10th Cir. 2019)(citing Chaidez v. United States, 568 U.S. 342, 345 (2013)), cert. denied, 140 U.S. 470 (2019).  A coram nobis petitioner should be rejected if the "claim was raised or could have been raised on direct appeal or through a § 2255 motion, or in any other prior collateral attack on the conviction or sentence."  United States v. Miles, 923 F.3d at 804.  Nevertheless, that a coram nobis petitioner could have raised a claim while in custody does not bar the petitioner from coram nobis eligibility.  See United States v. Morgan, 346 U.S. 502, 512 (1954)(concluding that the petitioner met threshold requirement for coram nobis relief even though the petitioner could have raised denial of counsel claim by filing § 2255 motion while incarcerated).  Additionally, a petitioner cannot use coram nobis to reach issues that the petitioner could have raised on direct appeal or to litigate issues already litigated.  See Barnickel v. United States; 113 F.3d 704, 706 (7th Cir. 1997); Klein v. United States, 880 F.2d at 254.

Finally, "the burden is on the petitioner to demonstrate that the asserted error is jurisdictional or constitutional and results in a complete miscarriage of justice."  Klein v. United States, 880 F.2d at 254.  See United States v. Morgan, 346 U.S. at 511("This extraordinary remedy

[should] only under circumstances compelling such action to achieve justice.").  Generally, courts

will issue writs of coram nobis only to correct "errors of fact" that, through no negligence on the

defendant's part, were not part of the original record and that "would have prevented rendition of

the judgment questioned."     United States v. Lowe, 6  F. App'x 832, 834 (10th Cir.

2001)(unpublished)(quoting Black's Law Dictionary 304-05 (5th Ed. 1979)).  The United States

Court of Appeals for the Seventh Circuit has held that, when alleging newly discovered evidence,

the petitioner must show that the petitioner's due diligence could not have revealed the evidence

before trial and that the evidence would likely have led to a different result.  See United States v.

Scherer, 673 F.2d 176, 178 (7th Cir. 1982).  When a person cannot bring a § 2255 petition because

he or she is no longer in federal custody, therefore, federal courts may entertain coram nobis

petitions in "extraordinary cases presenting circumstances compelling its use to achieve justice."

Rawlins v. Kansas, 714 F.3d 1189, 1196 (10th Cir. 2013)(citing United States v. Denedo, 556 U.S.

904, 911 (2009)).

## LAW REGARDING EXPUNGEMENT OF ARREST AND CRIMINAL RECORDS

"A criminal record, in addition to causing personal embarrassment, may create collateral

consequences, such as barriers to obtaining or keeping employment, pursuing an education or

taking advantage of civic opportunities such as the right to vote or serve on juries." 37 James L.

Buchwalter, Causes of Action 2d 615 § 2 (2008).  See also U.S. Const. amend. XIV, § 2; 28 U.S.C.

§ 1865(b)(5); Richardson v. Ramirez, 418 U.S. 24 (1974).  A criminal record may also prevent an

individual from owning a firearm.  See Massachusetts Continuing Legal Education, Crime and

Consequence: The Collateral Effects of Criminal Conduct § 7.2 (2013).  Expungement's purpose is to provide relief from these barriers.[10]

Expungement is defined as "[t]he removal of a conviction (esp. for a first offense) from a person's criminal record."  Expungement of Record, Black's Law Dictionary (11th ed. 2019). However, there are few statutes that provide courts with expungement jurisdiction.  See United States v. Pinto, 1 F.3d at 1070 ("As an initial matter, 'there was no statutory authority for the district court's expunction order. Rather, any authority to order expungement must stem from the inherent equitable powers of the court.")(quoting United States v. Smith, 940 F.2d at 396); Mackenzie J. Yee, Expungement Law: An Extraordinary Remedy for an Extraordinary Harm, 25 Geo. J. Poverty L. & Policy 169, 191 (2017)("Under current law, statutory authority to expunge federal criminal records only exists to a very limited extent, providing, for example, for the amendment of records; the expungement of records in specified drug offense cases; and the expungement of DNA analyses for acquitted, overturned, or dismissed cases.").

In the Tenth Circuit, absent relevant statutory authority, a court's authority to issue an expungement "must stem from the inherent equitable powers of the court."  United States v. Pinto, 1 F.3d at 1070.  See United States v. Linn, 513 F.2d at 927 ("[T]he power to expunge an arrest record is a narrow one, and should not be routinely used whenever a criminal prosecution ends in an acquittal, but should be reserved for the unusual or extreme case.").  Although the district court has discretion to expunge a criminal record, it "is not a remedy to be granted frequently."  United States v. Friesen, 853 F.2d 816, 817-18 (10th Cir. 1988)(Parker, J., sitting by designation).  See Bromley v. Crisp, 561 F.2d 1351, 1364 (10th Cir. 1977)(en banc)("[T]he [expungement] power is

---

[10]See Massachusetts Continuing Legal Education, Crime and Consequence: The Collateral Effects of Criminal Conduct §§ 18.6.1-7 (2013).

a narrow one, reserved for extreme cases."). <u>See also</u> 37 Buchwalter, <u>Causes of Action</u> 2d 615 § 4

("Federal courts . . . have generally been recognized to have inherent authority to expunge criminal

records in individual cases if extraordinary circumstances are presented.")(citing <u>United States v.</u>

<u>Crowell</u>, 374 F.3d 790 (9th Cir. 2004); <u>Camfield v. City of Oklahoma City</u>, 248 F.3d 1214 (10th

Cir. 2001)).

There is a substantial difference between "expunging the arrest record of a presumably

innocent person and expunging the conviction of a person adjudged as guilty in a court of law."

<u>United States v. Pinto</u>, 1 F.3d at 1070.  In a motion to expunge records of a criminal offense, the

motion "must allege that the conviction is legally infirm or was secured through improper

government conduct."  <u>United States v. Trzaska</u>, 781 F. App'x at 700-01 (citing <u>United States v.</u>

<u>Pinto</u>, 1 F.3d at 1070 and <u>Sanchez v. Melendrez</u>, 934 F. Supp. 2d 1325, 1342 (D.N.M.

2013)(Vázquez J.)).  Tenth Circuit case law supports "the notion that when a conviction is

somehow invalidated, such as by a finding that it was unconstitutional, illegal, or obtained through

government misconduct, a federal court may, in appropriate cases, grant expungement."  <u>Tokoph</u>

<u>v. United States</u>, 774 F.3d 1300, 1305 (10th Cir. 2014)(citing <u>United States v. Pinto</u>, 1 F.3d at

1070), <u>as amended on reh'g</u> (Jan. 26, 2015)).  As it relates to the expungement of an arrest record,

"an acquittal, standing alone, is not in itself sufficient to warrant an expunction of an arrest record."

<u>United States v. Linn</u>, 513 F.2d at 927-28 (citing <u>United States v. Seasholtz</u>, 376 F. Supp. 1288,

1288 (N.D. Okla. 1974)(Daugherty, J.); <u>United States v. Dooley</u>, 364 F. Supp. 75

(E.D.Pa.1973)(Newcomer, J.); and <u>United States v. Rosen</u>, 343 F. Supp. 804

(S.D.N.Y.1972)(Levet, J.)).  <u>See United States v. Friesen</u>, 853 F.2d 816, 818 (10th Cir.

1988)(explaining that "mere acquittal of the subsequent charge is an insufficient reason to grant

expunction").

The petitioner must show that their "averments are grounded in fact through some form of evidentiary showing," United States v. Trzaska, 781 F. App'x at 701.  If those facts are found to be true and if the situation is found to be "unusually compelling . . . these may be reasons to justify the exercise of the trial court's 'narrow' power to order expunction."  United States v. Friesen, 853 F.2d at 818 (quoting United States v. Linn, 513 F.2d at 927).  In assessing whether the circumstance is unusually compelling, a district court should "develop a complete factual record."  United States v. Trzaska, 781 F. App'x at 702 (citing Ray v. United States, 943 F.2d 57, [published in full-text format at 1991 U.S. App. LEXIS 21529] 1991 WL 172679, at *1 (10th Cir. 1991)).  See United States v. Williams, 582 F. Supp. 2d at 1347 ("In evaluating the individual harms caused by a criminal record, and in order to subsequently apply the balancing test, the court has emphasized the importance of evidentiary proof of actual adverse consequences suffered by the defendant.").  If the petitioner can show that his or her averment is founded through evidentiary proof, the court balances the harm to the petitioner against the state's interests "in maintaining criminal records and promoting effective law enforcement."  United States v. Trzaska, 781 F. App'x at 702 (citing United States v. Williams, 582 F. Supp. 2d at 1347).  See United States v. Linn, 513 F.2d at 927 ("Certain of the cases call for a 'balancing' of the equities between the Government's need to maintain extensive records in order to aid in general law enforcement and the individual's right of privacy.")(no citation for quotation).  Other district courts in the Tenth Circuit have concluded that opportunities for schooling, employment, or professional licenses are relevant factors when balancing interests.  See, e.g., United States v. Estes, 07-02337, 2007 WL 4564101, at *3 (D. Ariz. Dec. 20, 2007)(Jorgenson, J.)("[The petitioner] has outlined, and the Government is in accord, with the substantial harm that will be visited upon him regarding employment in the financial services industry."); United States v. Brennan, CR 06-0182 RBJ, 2015 WL 2208532, at *6-8, 17-

18 (D. Colo. April 27, 2015)(Jackson, J.)(granting expungement because of the great vocational harm caused to the petitioner, and the records served little if any government purpose)(citing Menard v. Mitchell, 430 F.2d 486 (D.C. Cir. 1970)(Bazelon, J.)).  Courts have also considered reputational and economic loss factors.  See Hall v. Alabama, CIV 09-0342, 2010 WL 582076, at *9 (M.D. Ala. Feb. 18, 2010)(Thompson, J.)("[I]njury to reputation and economic loss are but factors which the Court may consider or disregard in determining whether to expunge a person's arrest record."); United States v. Van Wagner, 746 F. Supp. 619, 620-21 (E.D. Va. 1990)(Ellis, J.)(holding that a petitioner who was mistakenly arrested and was "completely innocent of any crime" suffered "real and permanent economic damage" due to his arrest, thus warranting an expungement of his arrest record).  The court exercises its equitable discretion by balancing these considerations to determine whether "unusually compelling circumstances" are present and therefore warrant a grant of expungement.  United States v. Trzaska, 781 F. App'x at 703 (citing United States v. Friesen, 853 F.2d at 818).

## ANALYSIS

The Court will deny the United States' Motion to Dismiss, because the Court has inherent equitable jurisdiction over Shook's petition.  See United States v. Pinto, 1 F.3d at 1070. Nonetheless, Shook is ineligible for expungement, because Shook: (i) has not shown anything wrongful about his conviction; (ii) has not provided sufficient evidence of the adverse consequences he has suffered as a result of his conviction; (iii) has not shown that his need for expungement outweighs the United States' need to maintain accurate criminal records; and (iv) has not demonstrated that his situation is unusually compelling.  Accordingly, the Court will dismiss Shook's Petition.

## I.   THE COURT LACKS STATUTORY AUTHORITY TO GRANT SHOOK'S PETITION TO EXPUNGE HIS CRIMINAL RECORD.

There are only a handful of narrow statutes granting statutory expungement authority; these statutes are aimed largely at expunging drug possession convictions for young offenders and are inapplicable in Shook's case.  See United States v. Pinto, 1 F.3d at 1070; Mackenzie J. Yee, Expungement Law: An Extraordinary Remedy for an Extraordinary Harm, 25 Geo. J. Poverty L. & Policy at 191 ("Under current law, statutory authority to expunge federal criminal records only exists to a very limited extent.").   For example, statutory authority granting a district court jurisdiction to expunge criminal records arises from 18 U.S.C. § 3607(c), which provides:

> If the case against a person found guilty of an offense under section 404 of the Controlled Substances Act (21 U.S.C. § 844) is the subject of a disposition under subsection (a), and the person was less than twenty-one years old at the time of the offense, the court shall enter an expungement order upon the application of such person.  The expungement order shall direct that there be expunged from all official records, except the nonpublic records referred to in subsection (b), all references to his arrest for the offense, the institution of criminal proceedings against him, and the results thereof.  The effect of the order shall be to restore such person, in the contemplation of the law, to the status he occupied before such arrest or institution of criminal proceedings. . . .

18 U.S.C. § 3607(c).  See 18 U.S.C. § 844a(j)(providing for expungement where a defendant "knowingly possesses a controlled substance" in "a personal use amount").  There are also several statutes that allow expungement when a defendant's conviction has been overturned.  See, e.g., 10 U.S.C. § 1565(e)(1) ("The Secretary of Defense shall promptly expunge . . . the DNA analysis of a person included in the index on the basis of a qualifying military offense if the Secretary receives . . . a certified copy of a final court order establishing that such conviction has been overturned."); 34 U.S.C. § 12592(d)(1)(A) (instructing the director of the Federal Bureau of Investigation to expunge "the DNA analysis of a person included in the index" where the person's conviction was overturned or where a person was acquitted or was not charged following an arrest).

Statutes at the State level, which apply only to State convictions, also provide for expungement in some cases.  See, e.g., Maryland Second Chance Act of 2015, Md. Code Ann., Crim. Proc. §§ 10-301-10-306;  Ind. Code Ann. § 35-38-9-2 ("Not earlier than five (5) years after the date of conviction . . . the person convicted of the misdemeanor or the felony reduced to a misdemeanor may petition a court to expunge all conviction records.").  See also N.M.S.A. § 38-5-1 ("A person who was convicted of a felony and who meets all other requirements for eligibility may be summoned for jury service if the person has successfully completed all conditions of the sentence imposed for the felony, including conditions for probation or parole");  United States v. Reese, 2014-NMSC-013 ¶ 50, 326 P.3d 454, 465 (concluding that "dismissal of the criminal charges upon satisfaction of the conditions of deferment automatically restores a convicted felon's civil rights by operation of law").

None of the statutes apply in Shook's case, because Shook pled guilty to Bank Larceny, a federal felony, rather than a drug possession offense.  See Shook Aff. ¶¶ 1-2, at 1.  Moreover, Shook does not argue that the Court should overturn Shook's conviction, and the Court sees no basis to overturn Shook's conviction.  See Petition at 2.  Last, Shook does not identify, and the Court has not discovered, any expungement statute that is applicable in his case.  See Petition at 1-9.  Accordingly, the Court concludes that it lacks statutory jurisdiction over Shook's expungement request.  See United States v. Trzaska, 781 F. App'x at 69-70 (characterizing district courts' statutory authority to expunge arrest records as "very limited").

## II.     THE COURT HAS THE INHERENT EQUITABLE AUTHORITY TO EXPUNGE SHOOK'S CRIMINAL RECORD, BUT WILL NOT DO SO, BECAUSE SHOOK'S CASE DOES NOT PRESENT EXTRAORDINARY CIRCUMSTANCES.

The Tenth Circuit has held repeatedly that district courts have jurisdiction over equitable expungement petitions.  See, e.g., Bromley v. Crisp, 561 F.2d at 1364; United States v. Linn, 513

- 44 -

F.2d at 927.  "Although (with very limited exceptions not relevant here) district courts lack

statutory authority to expunge arrest records . . . we have held that they have the authority to do so

under their inherent equitable powers."  United States v. Trzaska, 781 F. App'x at 699 (citing

United States v. Pinto, 1 F.3d 1069, 1070 n.1 (10th Cir. 1993)).  The Tenth Circuit also recognizes

courts' equitable authority, a form of ancillary jurisdiction, to expunge a defendant's conviction.

See United States v. Pinto, 1 F.3d at 1070.[11]  Nonetheless, "courts have inherent equitable authority

---

[11]A split exists among the Courts of Appeals whether courts have ancillary jurisdiction over expungement petitions.  See Richard D. Freer, "Ancillary" Jurisdiction over Related Proceedings, in Wright & Miller, 13 Fed. Prac. & Proc. § 3523.2 (3d ed.).  On a clean slate, the Court would hold with the majority of United States Courts of Appeals and conclude that it lacks jurisdiction over equitable expungement petitions like Shook's.  The Courts of Appeals' disagreement regarding ancillary jurisdiction stems primarily from their interpretation of the Supreme Court's decision in Kokkonen, which states in relevant part:

> Generally speaking, we have asserted ancillary jurisdiction (in the very broad sense in which that term is sometimes used) for two separate, though sometimes related, purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent, see, e.g., Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 469, n. 1 (1974); Moore v. New York Cotton Exchange, 270 U.S. 593, 610 (1926); and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees, see, e.g., Chambers v. NASCO, Inc., 501 U.S. 32 (1991) (power to compel payment of opposing party's attorney's fees as sanction for misconduct); United States v. Hudson, 11 U.S. (7 Cranch) 32, 34 (1812) (contempt power to maintain order during proceedings).

Kokkonen, 511 U.S. at 379-80.  The Supreme Court explains that, when a court refers to its "inherent power" to adjudicate a proceeding, as does the Tenth Circuit in deciding expungement petitions, it applies "the second head of ancillary jurisdiction, relating to the court's power to protect its proceedings and vindicate its authority."  Kokkonen, 511 U.S. at 379-80.  See United States v. Pinto, 1 F.3d at 1070.  Courts of Appeals have distinguished between whether a petitioner seeks to expunge: (i) a record of arrest or a record of conviction; and (ii) a judicial branch record or an executive branch record.  Shook "requests that all record of his federal felony conviction from 1992 be expunged"; thus, the issue here is whether the Court has jurisdiction to expunge both a judicial branch and an executive branch record of conviction.  Petition at 8.  The Court concludes, however, that neither distinction is salient for subject-matter jurisdiction purposes.

  Although none of its earlier opinions on expungement acknowledge Kokkonen, the Tenth Circuit eventually addressed Kokkonen in an unpublished 2019 opinion, noting its awareness of a

"'growing appellate consensus' that federal courts lack inherent authority to expunge criminal records relying solely upon equitable grounds." United States v. Trzaska, 781 F. App'x at 699 n.2 (quoting United States v. Wahi, 850 F.3d 296, 298 (7th Cir. 2017)). Nonetheless, the Tenth Circuit maintains its position that district courts have inherent authority to grant expungement petitions on equitable grounds. See United States v. Trzaska, 781 F. App'x at 699 n.2. The Tenth Circuit notes that, without en banc consideration, its precedent -- both pre- and post- Kokkonen -- do not allow it to hold "that district courts lack jurisdiction to consider petitions for equitable expungement." 781 F. App'x at 699 n.2 (citing Camfield v. City of Okla. City, 248 F.3d 1214, 1234 (10th Cir. 2001)). Although Tenth Circuit precedent makes clear that the Court has jurisdiction over Shook's petition, on a clean slate, the Court would conclude otherwise.

In the Court's view, the Court does not have power to expunge records of a lawful conviction or arrest -- in other words, on equitable grounds, rather than via a writ of coram nobis. See United States v. Coloian, 480 F.3d 47, 50 (1st Cir. 2007)(describing equitable jurisdiction in expungement cases). First, considering the Kokkonen test, the Court would conclude that courts have ancillary jurisdiction over expungement petitions only where their own convictions are unlawful or otherwise invalid. Applying Kokkonen's bases for jurisdiction to Shook's case, both are inapplicable. Shook's request for equitable expungement is not "factually interdependent" with his underlying criminal conviction, because Shook's primary arguments in his Petition are that: (i) his criminal conviction should be expunged to allow him to own a firearm; and (ii) he has maintained a clean criminal record since his 1992 conviction. Kokkonen, 511 U.S. at 379-80. See Petition at 1-3. These facts arose after Shook's criminal conviction and are distinct spatially, temporally, and in subject matter from the facts underlying his conviction. Next, asserting jurisdiction over Shook's petition also would not enable the Court to "manage its proceedings, vindicate its authority, and effectuate its decrees," Kokkonen, 511 U.S. at 379-80; the Court's need to effectuate its decree -- Shook's sentence -- ended after Shook completed supervised release in 1993, see J&C at 1-4.

Second, separation of powers concerns animate the Court's conclusion. Congress has specifically granted statutory jurisdiction to expunge convictions in other specific circumstances; the Court should not invent additional bases for jurisdiction. See, e.g., 18 U.S.C. § 3607(c); 18 U.S.C. § 844a(j). The Court also agrees with the United States Court of Appeals for the Ninth Circuit's conclusion that, "[i]n eliminating the record of a conviction and arrest, expungement necessarily nullifies a law which Congress has properly enacted and which the Executive has successfully enforced." United States v. Sumner, 226 F.3d 1005, 1014 (9th Cir. 2000).

Third, the Tenth Circuit's conclusory recitation of its precedent -- none of which discussed the Supreme Court's 1994 opinion in Kokkonen -- absent further justification for its position, rings hollow. Even in United States v. Trzaska, the Tenth Circuit still did not address directly how Kokkonen applies to expungement petitions, other than to note that Kokkonen does not discuss expungement petitions directly. See United States v. Trzaska, 781 F. App'x at 699 n.2. Notably, other than the Tenth Circuit, every Court of Appeals to address the issue post-Kokkonen that acknowledges Kokkonen has held the opposite. See United States v. Adalikwu, 757 F. App'x 909, 912 (11th Cir. 2018)(concluding that a petitioner seeking expungement of his judicial conviction record was "pursuant to Kokkonen, . . . not entitled to expungement of judicial records" because "he has not met his burden of establishing subject matter jurisdiction over his motion"); United States v. Wahi, 850 F.3d 296, 298 (7th Cir. 2017)(overruling its existing precedent and holding

to order the expungement" only "in rare or extreme instances."  Camfield v. City of Oklahoma City, 248 F.3d at 1234 (citing United States v. Pinto, 1 F.3d at 1070; United States v. Linn, 513 F.2d at 927).

The Tenth Circuit has enunciated a four-part test to determine whether a district court may expunge a petitioner's criminal conviction.  See United States v. Trzaska, 781 F. App'x at 700-01. At step one, where, as here, the petitioner files "a motion to expunge records of criminal convictions -- as opposed to records of an arrest or dismissal of charges -- we have said that the

---

that "a petition for equitable expungement satisfies neither of Kokkonen's criteria for the assertion of ancillary jurisdiction"); United States v. Mettetal, 714 F. App'x 230, 235 (4th Cir. 2017)(Wilkinson, J.)("Kokkonen delineates two circumstances in which federal courts can invoke ancillary jurisdiction.  Neither applies to petitions for equitable expungement."); Doe v. United States, 833 F.3d 192, 199 (2d Cir. 2016)(Lohier, J.)("[W]e hold that the District Court's exercise of ancillary jurisdiction in this case served neither of the goals identified in Kokkonen.  Our holding is in accord with that of every other sister Circuit to have addressed the issue since Kokkonen."); United States v. Field, 756 F.3d 911, 915 (6th Cir. 2014)("[F]ederal courts lack ancillary jurisdiction over motions for expungement that are grounded on purely equitable considerations -- e.g., motions alleging that the movant has maintained good conduct and that the record of arrest harms the movant's employment opportunities. "); United States v. Coloian, 480 F.3d 47, 52 (1st Cir. 2007)("Kokkonen forecloses any ancillary jurisdiction to order expungement based on Coloian's proffered equitable reasons."); United States v. Meyer, 439 F.3d 855, 862 (8th Cir. 2006)("[I]n light of Kokkonen, we conclude that ancillary jurisdiction does not extend to expungement of a criminal conviction where the petitioner asserts solely equitable grounds."); United States v. Dunegan, 251 F.3d 477, 480 (3d Cir. 2001)("[W]e hold that in the absence of any applicable statute enacted by Congress, or an allegation that the criminal proceedings were invalid or illegal, a District Court does not have the jurisdiction to expunge a criminal record, even when ending in an acquittal."); United States v. Sumner, 226 F.3d 1005, 1014 (9th Cir. 2000)(concluding that district courts lack "the power to expunge a record of a valid arrest and conviction solely for equitable considerations.  In our view, a district court's ancillary jurisdiction is limited to expunging the record of an unlawful arrest or conviction, or to correcting a clerical error.").  The Court is aware of the tension between "these constitutional concerns and the recognition that the collateral consequences of convictions -- especially nonviolent felony convictions on otherwise clean criminal records -- are" at times "disproportionate to a felon's original culpability."  Criminal Procedure-Ancillary Jurisdiction -- District Court Grants Motion to Expunge Conviction for Equitable Reasons, 129 Harv. L. Rev. 582, 589 (2015).  Still, the Court sees no basis, other than raw judicial power, upon which to expunge Shook's criminal record.  Nonetheless, as a faithful district court, the Court will follow the Tenth Circuit's test for expungement and conclude in the Analysis below that it has jurisdiction over Shook's petition.

motion must allege that the conviction is legally infirm or was secured through improper government conduct." United States v. Trzaska, 781 F. App'x at 700-01 (emphasis in original). If a petitioner sufficiently alleges that the conviction is somehow legally invalid, the petitioner then, at step two, "must establish that his or her averments are grounded in fact through some form of evidentiary showing." United States v. Trzaska, 781 F. App'x at 701. If the petitioner makes a sufficient factual showing, a court, at step three, must balance "the interests of the State in maintaining records for law enforcement against the individual's rights." Bromley v. Crisp, 561 F.2d at 1364. After applying the balancing test, if a court determines that the individual's interests outweigh the State's, a court should, at step four, evaluate whether there are "unusually compelling circumstances," United States v. Friesen, 853 F.2d at 816, given that a court's expungement "power is a narrow one, reserved for extreme cases," Bromley v. Crisp, 561 F.2d at 1364. See United States v. Pinto, 1 F.3d at 1070 ("We . . . conclude that federal courts may, in extreme cases, expunge a federal conviction that has, in some manner, been invalidated."). A court may consider factors including: (i) the conviction's age; (ii) the petitioner's innocence or guilt; and (iii) the harm to the petitioner's employment and reputation. See United States v. Trzaska, 781 F. App'x at 701.

Shook is ineligible for expungement under the Tenth's Circuit's test.[12] Shook is unsuccessful at the test's first step, because he does not "allege that the conviction is legally infirm or was secured through improper government conduct." United States v. Trzaska, 781 F. App'x at 700-01. Shook admits that expungement typically requires "some sort of law or constitutional

---

[12]Although the Court cannot properly grant relief in Shook's case, Shook could seek a Presidential pardon through an application with the United States Department of Justice. See Pardon Information and Instructions, the United States Department of Justice (Nov. 23, 2018), https://www.justice.gov/pardon/pardon-information-and-instructions.

failing in the original conviction," in many circumstances, but does not assert that any existed in this case.  Tr. at 17:10-17 (Monagle).  Because Shook does not satisfy the Tenth Circuit's first step, his petition necessarily fails; the Court, however, will nonetheless analyze the remaining steps.

At step two, Shook likewise does not make a sufficient evidentiary showing, because the evidentiary showing must demonstrate, in part, that Shook's conviction is somehow unlawful.  See United States v. Trzaska, 781 F. App'x at 701; Petition at 1-8.  Even if Shook did not need to provide evidence that his conviction is unlawful, he also provides insufficient evidence of his assertions that his conviction imposes significant limitations on his current life.  See Petition at 1-9.  Shook identifies three reasons his conviction negatively affects his life.  See Petition at 6-7.  First, Shook's primary concern is that he "is a patriotic individual who would like to purchase and possess a firearm for the purpose of protecting his home."  Petition at 6.  Second, Shook alleges that his conviction has limited his ability to advance in his career, noting that "numerous job opportunities outside of TLC [Plumbing Company] have been foreclosed to Mr. Shook by his own conviction, including professional work with a number of casinos across the Southwest."  Petition at 6-7.  Third, Shook notes his concern that, as a result of filing this Petition, he will "digitally update" his file in the FBI database, which will cause him to be unable to do plumbing work "in area casinos, state and federal corrections facilities, and on Kirtland Air Force Base."  Petition at 7.  Shook's first assertion, that he cannot own a firearm, requires no evidence, given that 18 U.S.C. § 922(g) provides:

> It shall be unlawful for any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has

been shipped or transported in interstate or foreign commerce.

As to Shook's second assertion, he provides no evidence of or details regarding job opportunities that he has been denied.[13]  Shook's third assertion is speculative, and again, the Court has received no documentary evidence that Shook has been unable to work in the facilities he mentioned, or that the FBI has "digitally updated" Shook's file.  At the hearing, which took place two-and-a-half years after Shook filed his Petition, Shook also did not mention whether this fear had come to fruition.

As to step three, Shook's desire to expunge his criminal record does not outweigh the United States' interest in maintaining his federal criminal record, because: (i) there are protections available to Shook to help him avoid adverse employment consequences as a result of his criminal record; and (ii) Congress has a strong interest in protecting the public by preventing convicted felons from possessing firearms.  See Petition at 8.  In sum, Shook's argument is that, given the age of his conviction, which occurred nearly thirty years ago, and his otherwise clean record, he should no longer experience the collateral consequences of his federal felony conviction -- specifically, his employment advancement and his ability to own a firearm.  See J&C at 2; United

---

[13]At the hearing, Shook requested an evidentiary hearing to "lay out in detail" how he has lived his life and how his conviction has affected his "life and restricted his rights over those twenty-five years."  Tr. at 21:1-11 (Monagle).  The Court scheduled a hearing and, if he wanted to present evidence, he should have presented that evidence at the hearing that the Court set.  The Court will not schedule an additional hearing in this case, because, even if Shook presents such evidence, the Court will not grant his Petition.  See United States v. Trzaska, 781 F. App'x at 701 ("An expungement motion may fail to aver a legally viable claim for relief on its face; if so, it should be denied on that basis.").  A second hearing, therefore, would not be a wise use of the Court's and the parties' time.  Moreover, it is unclear why, if documentary evidence related to Shook's employment assertions exists, Shook did not submit that evidence with his Petition or his Response, given that Shook submitted other documentary evidence, including a copy of his Background Check with the Petition.

States v. Trzaska, 781 F. App'x at 701.  The Honorable Samuel Alito, Associate Justice for the

Supreme Court, has summarized some of the most common collateral consequences felony

convictions may carry:

> [C]riminal convictions can carry a wide variety of consequences other than
> conviction and sentencing, including civil commitment, civil forfeiture, the loss of
> the right to vote, disqualification from public benefits, ineligibility to possess
> firearms, dishonorable discharge from the Armed Forces, and loss of business or
> professional licenses.  Chin & Holmes, [Effective Assistance of Counsel and the
> Consequences of Guilty Pleas, 87 Cornell L. Rev. 697,] 705-06.  A criminal
> conviction may also severely damage a defendant's reputation and thus impair the
> defendant's ability to obtain future employment or business opportunities.

Padilla v. Kentucky, 559 U.S. 356, 376-77 (2010)(Alito, J., concurring)(also citing deportation as

a possible collateral consequence of a felony conviction).  See Becerra v. Schauer, No. CIV 10-

0603 JB/CEG, 2010 WL 11619134, at *2 (D.N.M. Aug. 25, 2010)(Browning, J.)(concluding that

the requirement to register as a sex offender is a collateral consequence of a sex offense

conviction); Paul T. Crane, Charging on the Margin, 57 Wm. & Mary L. Rev. 775, 785

(2016)(describing collateral consequences of felony convictions including preclusion from juror

service, bans on running for public office, termination or limitation of parental rights, and-for

noncitizen defendants-deportation).  Of the many possible consequences of Shook's felony

conviction, he takes issue only with the adverse employment consequences and with his inability

to own a firearm.  See Petition at 8.

Regarding Shook's alleged adverse employment consequences, changes at both the New

Mexico and federal levels have made employers increasingly hospitable to applicants with felony

convictions and particularly to persons like Shook with very old convictions.  In New Mexico,

where a private employer "uses a written or electronic employment application, the employer shall

not make an inquiry regarding an applicant's history of arrest or conviction on the employment

application but may take into consideration an applicant's conviction after review of the applicant's application and upon discussion of employment with the applicant."  N.M.S.A. § 28-2-3.1(A).[14]  New Mexico also prohibits credit bureaus, upon which most private employers rely for background checks, from reporting "arrests and indictments pending trial, or convictions of crimes," after "seven years from date of release or parole."  N.M.S.A. § 56-3-6(A)(5).  Because Shook's conviction is more than seven years old, were Shook to apply for a job in New Mexico, credit bureaus would be prohibited from reporting his 1992 offense.  See N.M.S.A. § 56-3-6(A)(5).  At the federal level, the Equal Employment Opportunity Commission ("EEOC") has issued guidance stating that an "employer's use of an individual's criminal history in making employment decisions may, in some instances, violate the prohibition against employment discrimination under Title VII of the Civil Rights Act of 1964."  <u>Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act</u> (dated April 25, 2012), EEOC, https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions#sdendnote110anc  ("<u>EEOC</u>

---

[14]So-called "ban the box" laws have been growing in popularity nationwide, and aim to "provide applicants a fair chance at employment by removing conviction and arrest history questions from job applications and delaying background checks until later in the hiring process." <u>Ban the Box</u>, National Conference of State Legislatures (June 29, 2021), https://www.ncsl.org/research/civil-and-criminal-justice/ban-the-box.aspx (noting that, between 2017 and 2020, Washington, Utah, Nevada, Michigan, California, North Dakota, New Hampshire, and Colorado passed ban the box legislation). <u>See</u> <u>Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act</u> (dated April 25, 2012), EEOC, https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions#sdendnote110anc.  ("The policy rationale is that an employer is more likely to objectively assess the relevance of an applicant's conviction if it becomes known when the employer is already knowledgeable about the applicant's qualifications and experience.").  Empirical research on ban-the-box laws shows improvement in employment outcomes for job applicants with criminal convictions. <u>See</u> <u>Ban the Box</u>, National Conference of State Legislatures (June 29, 2021), https://www.ncsl.org/research/civil-and-criminal-justice/ban-the-box.aspx.

Guidance").   Similar to N.M.S.A. § 28-2-3.1(A), the EEOC recommends "[a]s a best practice . . . that employers not ask about convictions on job applications and that, if and when they make such inquiries, the inquiries be limited to convictions for which exclusion would be job related for the position in question and consistent with business necessity." EEOC Guidance.  The EEOC also suggests that employers asking applicants about past convictions

> develop[] a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job . . . and then provide[] an opportunity for an individualized assessment for people excluded by the screen to determine whether the policy as applied is job related and consistent with business necessity.

EEOC Guidance (citing Green v. Missouri Pacific R.R., 549 F.2d 1158 (8th Cir. 1977)).  Congress has also created statutory protections for job applicants with felony convictions.  The Fair Chance Act, which goes into effect in December, 2021, has a primary purpose of "prohibit[ing] Federal agencies and Federal contractors from requesting that an applicant for employment disclose criminal history record information before the applicant has received a conditional offer, and for other purposes."  Fair Change to Compete for Jobs Act of 2019, Pub. L. 116-92, S. 387, 116th Cong. (1st Sess. 2019)(codified as amended at 5 U.S.C. § 9202).  The Act forbids federal agencies from requesting "that an applicant for an appointment to a position in the civil service disclose criminal history record information regarding the applicant before the appointing authority extends a conditional offer to the applicant."  5 U.S.C. § 9202(a).  See 41 U.S.C. 4714(a)(1)(creating the same requirement for persons or entities applying for a federal contract).  Accordingly, although it is possible that Shook will experience adverse consequences as a result of his felon status, if Shook applies for private or public employment in New Mexico, or to work for the federal government, he will benefit from substantial protections that have been demonstrated statistically to improve outcomes for job applicants with felonies.

Next, the lifelong prohibition on felons possessing firearms is one that Congress and the Supreme Court have recognized as an important federal interest for nearly a century.  As the Supreme Court emphasized in District of Columbia v. Heller, 554 U.S. 570 (2008)(Scalia, J.), "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ."  554 U.S. at 626-27.  See McDonald v. City of Chicago, Ill., 561 U.S. 742, 786 (2010)(reiterating that its "holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill").  See also United States v. Molina, 484 F. App'x 276, 285 (10th Cir. 2012)(explaining that felons have no Second Amendment[15] right to bear arms).  In 1938, Congress passed the Federal Firearms Act of 1938, which prohibits firearm ownership for those convicted of violent crimes.  See Federal Firearms Act, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250-51 (1938).  "The law was expanded to encompass all individuals convicted of a felony (and to omit misdemeanants from its scope) several decades later, in 1961.  See An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, § 2, 75 Stat. 757, 757 (1961)."  United States v. Booker, 644 F.3d 12, 24 (1st Cir. 2011)(discussing the history of firearm prohibitions).  Then, in 1965, an addendum to the Federal Firearms Act allowed felons to apply to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to restore their firearm rights.  See 18 U.S.C. § 925(c).  Since 1992, however, an appropriations bar has prohibited the ATF from using federal funds to restore felons' right to possess a firearm.  See United States v. Bean, 537 U.S. 71, 74 (2002); Is there a way for a prohibited person to restore their right to receive or possess firearms and ammunition?,

---

[15]U.S. Const. amend. II.

ATF (Aug. 21, 2019), https://www.atf.gov/firearms/qa/there-way-prohibited-person
-restore-their-right-receive-or-possess-firearms-and ("Although federal law provides a means for
the relief of firearms disabilities, ATF's annual appropriation since October 1992 has prohibited
the expending of any funds to investigate or act upon applications for relief from federal firearms
disabilities submitted by individuals."). The United States had a program in place allowing federal
felons to apply for rights restoration for almost twenty-five years. Following its analysis of the
ATF restoration program, however, Congress determined that it was unsafe to restore felons' right
to possess firearms, given that some of the felons whose rights had been restored went on to
commit violent crimes involving firearms. In sum, Congress has demonstrated a strong
governmental interest in preventing federal felons from possessing firearms; it is not the Court's
role to question Congress' judgment on the matter. Moreover, generally speaking, Congress has
exhibited a desire to maintain accurate criminal records. See 28 U.S.C. § 534. Shook was guilty
of the crime to which he pled. See Plea Agreement at 1-3. The Court cannot conclude soundly
that Shook's desire to own a firearm outweighs the United States' interest -- bolstered by nearly a
century of various prohibitions on felon gun ownership -- in maintaining a record of Shook's
conviction so that it can prevent him from owning a firearm.

As to step four, Shook's case does not present extreme or unusually compelling
circumstances, because the harms he identifies -- inability to own a firearm and alleged adverse
employment consequences -- are common to all persons convicted of federal felonies. See Tr. at
26:3-22 (Court). The Tenth Circuit has held that a petitioner's case may demonstrate such
circumstances where his or her crime presents "'opprobrium not inherent in other crimes.'" United
States v. Trzaska, 781 F. App'x at 704 (quoting United States v. Friesen, 853 F.2d at 818). The
Tenth Circuit has recognized, for example, the "acute opprobrium inherent in" child pornography

offenses.  United States v. Trzaska, 781 F. App'x at 704.  The Court sees no evidence, and Shook does not argue, that Bank Larceny Aiding and Abetting -- a nonviolent offense in which Shook played a secondary role -- is stigmatized more severely than other felonies.  That conclusion does not mean there is no stigma associated with Shook's crime; all felonies carry some level of social stigma.  See Reno v. Am. C.L. Union, 521 U.S. 844, 872 (1997)(noting that every criminal conviction involves "opprobrium and stigma").  Because the consequences associated with Shook's criminal conviction are common to all federal felons, and because Shook's crime does not carry an especially severe stigma, the Court concludes that Shook's circumstances are routine, rather than extreme or unusually compelling.  See United States v. Friesen, 853 F.2d at 818. Consequently, given that none of the four steps the Tenth Circuit describes favor Shook, the Court will deny Shook's Petition.

**III.   UNITED STATES V. WILLIAMS IS NOT PERSUASIVE TO THE COURT, BUT, EVEN IF IT WERE PERSUASIVE, SHOOK WOULD NOT SATISFY ITS TEST.**

Shook relies heavily on United States v. Williams, 582 F. Supp. 2d 1345, because, he asserts, it is "very factually similar to the case at hand . . . [and] one of the major reasons that we . . . fil[ed] the petition for expungement."  Tr. at 17:10-17 (Monagle).  The Court concludes that the Honorable John Thomas Greene, United States District Judge for the United States District Court for the District of Utah, did not apply the correct test, because, although the petitioner asked Judge Greene to expunge his conviction, Judge Greene did not consider the Tenth Circuit's requirement that the petitioner's conviction had been "somehow invalidated, such as by a finding that it was unconstitutional, illegal, or obtained through government misconduct . . . ."  United States v. Pinto, 1 F.3d at 1070.  See United States v. Trzaska, 781 F. App'x at 700-01.  Judge Greene's opinion does not bind the Court, and United States v. Williams is not persuasive, because

it does not apply correctly applicable Tenth Circuit precedent.  See United States v. Ward, No. CR 06-0538 CW, 2009 WL 5216861, at *1 (D. Utah Dec. 29, 2009)(Waddoups, J.)(concluding that "the Williams court improperly relied on Linn to dictate the standard for an expungement of a conviction").  Moreover, even if the Court decided that United States v. Williams is persuasive, Shook still would not be eligible for relief.

The petitioner in United States v. Williams was convicted of distributing cocaine under 21 U.S.C. § 841(a)(1) while a college student.  See United States v. Williams, 582 F. Supp. 2d at 1346.  Approximately twenty years after his conviction, he applied for expungement.  See 582 F. Supp. 2d at 1346.  Since his conviction, the petitioner had served three years' probation "without incident" and had "been a law abiding citizen."  582 F. Supp. 2d at 1346.  The petitioner also had "graduated from college with high marks, maintained steady employment while excelling in the workplace, was married during the past ten years, and has been, and still remains, a loving and devoted father who is very involved in the lives of his three children."  582 F. Supp. 2d at 1346. The petitioner's conviction had negatively impacted his life, including limiting his ability to be promoted at work, and prohibiting him from voting or owning a firearm.  See 582 F. Supp. 2d at 1346.  Judge Greene emphasizes that, "[a]s a patriotic individual and a hunter, Mr. Williams would like to regain these privileges."  582 F. Supp. 2d at 1346.  The United States also supported the petitioner's position, and told Judge Greene that "the adverse consequences that Mr. Williams is suffering due to the record of his conviction far outweigh the value to the government of keeping a record of his conviction."  582 F. Supp. 2d at 1346.  Judge Greene adopted the United States' position, applying a balancing test and agreeing that, "[w]hen the State's interest in maintaining Mr. Williams' record are weighed against the actual harms that Mr. Williams has suffered and is suffering due to this record, expunction is an appropriate remedy."  582 F. Supp. 2d at 1347.  Judge

Greene emphasizes "the importance of factual evidence showing actual adverse consequences to the defendant . . . ."  582 F. Supp. 2d at 1347.  Judge Greene notes that the petitioner submitted evidence, including a copy of his company's employment policy, which stated that "he will not qualify for any further promotion due to his past unexpunged criminal record."  582 F. Supp. 2d at 1348.  The petitioner also testified before Judge Greene regarding "other missed opportunities stemming from the existence of his criminal record."  582 F. Supp. 2d at 1348.  Judge Greene also concludes that the petitioner's case presents unusually compelling circumstances, because the United States did not oppose the motion, stating that the "government's unique willingness to offer this defense is indicative of the rarity of Mr. Williams' situation and justifies the exercise of the court's narrow power to order expunction."  582 F. Supp. 2d at 1348.  Judge Greene explains that the United States' argument in the petitioner's favor "has impressed upon the court that this is a case based on evidence in which the personal harms suffered by Mr. Williams far outweigh the government's interest in maintaining a record of his long past conviction."  582 F. Supp. 2d at 1348.

Even if the Court concludes that United States v. Williams is persuasive authority -- which it does not -- the Court still will not expunge Shook's criminal conviction under Judge Green's analysis, which omits the first step of the Tenth Circuit's expungement analysis, but applies steps two, three, and four.  Shook's case is distinguishable from United States v. Williams in three key ways.  First, Shook's crime, aiding and abetting a bank robbery in which a gun was brandished, is more serious than the petitioner's crime in United States v. Williams -- cocaine possession. Second, the United States v. Williams petitioner submitted evidence of the adverse employment consequences he suffered, including: (i) a copy of his company's employment policy stating that he could not qualify for further promotions because of his criminal record, and (ii) in-person

testimony regarding other employment opportunities for which the petitioner did not qualify because of his felony status.  See 582 F. Supp. 2d at 1348.  By contrast, here, the only evidence of Shook's adverse employment consequences is a single sentence in his Affidavit: "[M]y felony conviction restricted the range of projects in which I could participate at TLC," Shook's employer, "and ultimately limited my upward advancement within the company."  Shook Aff. ¶ 12, at 2. Shook does not provide any specific information regarding how his felony conviction has limited his upward advancement, including specific promotions he was denied;  Judge Greene emphasized "the importance of factual evidence showing actual adverse consequences to the defendant . . . ." 582 F. Supp. 2d at 1347.   Because of the limited factual basis for adverse employment consequences with which Shook has provided the Court, Shook's Petition is unsatisfactory under the United States v. Williams analysis.  Third, the petitioner in United States v. Williams received strong support from the United States; the United States (i) argued that "the adverse consequences that Mr. Williams is suffering due to the record of his conviction far outweigh the value to the government of keeping a record of his conviction,"  582 F. Supp. 2d at 1346; and (ii) supported the petition, which, on its own, was "unique" and caused Judge Greene to conclude that its "willingness to offer this defense is indicative of the rarity of Mr. Williams' situation and justifies the exercise of the court's narrow power to order expunction," 582 F. Supp. 2d at 1348.  By contrast, in Shook's case, the United States actively opposes his Petition.  See Motion at 1-2. Shook argues that "the attempts of the Government's attorneys to pick and choose which citizens will have their fundamental rights restored (and which will not) seems to encroach upon the role of this Court as a neutral arbiter."  Response at 3.  Yet, because the United States v. Williams analysis involves balancing the United States' interests against the petitioner's, the United States' position is important.  In sum, because: (i) Shook's crime was more severe than the petitioner's in

United States v. Williams; (ii) Shook presents very limited evidence of the adverse consequences of his criminal record; and (iii) the United States does not support Shook's Petition, Shook's case is distinguishable from the petitioner's case in United States v. Williams and would be unsuccessful under the test laid out there.

**IT IS ORDERED** that: (i) the Petitioner James Shook's Petition for Expungement of a Criminal Offense at 1, filed March 3, 2017 (Doc. 1), is dismissed; and (ii) the Respondent United States of America's Motion to Dismiss Based on Lack of Jurisdiction, filed March 27, 2017 (Doc. 4), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Levi Albert Monagle
Hall & Monagle, LLC
Albuquerque, New Mexico

     *Attorneys for the Petitioner*

Fred J. Federici
  Acting United States Attorney
Edward Han
Jack Burkhead
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Respondent*